UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

JASON KESSLER               )
                                    )
            Plaintiff,       )
                                    )
       v.                 )     Case No. 3:18cv00015-NKM-JCH
                                    )
CITY OF CHARLOTTESVILLE   )
MAURICE JONES          )
Charlottesville City Manager    )
In his individual and official capacities )
                                    )
           Defendants.    )

---

**OPPOSITION OF DEFENDANTS CITY OF CHARLOTTESVILLE AND
MAURICE JONES TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Defendants City of Charlottesville ("City") and Maurice Jones, through undersigned counsel, file this opposition to Plaintiff's motion for a preliminary injunction. The Motion wholly fails to meet the extraordinarily high burden for a mandatory preliminary injunction and should be denied.

## I.    INTRODUCTION AND SUMMARY

In this action Plaintiff Jason Kessler, the "principal organizer" of the "Unite the Right" event in Charlottesville on August 12, 2017, seeks to compel the City of Charlottesville to grant him a permit for an "anniversary" event on August 11 and 12, 2018. Kessler is calling this "Unite the Right 2" or "UTR2." Pl. Mem. at 1.[1] At the deposition of Charlottesville City Manager Maurice Jones, who made the decision to deny the permit and who is a defendant in this action along with the City, Plaintiff's counsel elicited the following testimony:

---

[1]     We will refer to the memorandum filed in support of Plaintiff's Motion for a Preliminary Injunction and/or Temporary Restraining Order as "Pl. mem." although it is titled "Motion."

Q: Does the expected hostility to Mr. Kessler's message play any part in your decision to grant or deny Mr. Kessler a permit?
A: No.

***

Q: Did any City councilors request that you deny Mr. Kessler a permit prior to the August 2017 rally?
A: I'm trying—just trying to remember, I don't, I mean, to use that specific language to deny the permit. I think there were—there were councilors who were concerned about it. And we had discussions over the—the—the content, and they were concerned about that. But my response was we protect the First Amendment, and I've spoken to council about that both privately and publicly on numerous occasions.
Q: Would your answer be the same as to the request for a permit for August 2018?
A: I did not have any specific discussions with the council about the—in which they said you have to deny the permit.
Q: So there's been no political pressure, whatsoever, regarding Mr. Kessler and his permit?
A: Oh, that's not—that—yeah, that's not the same thing. You're asking—there's been ton of political pressure in our community concerning these—these permits. There were certainly in advance of last year, and there's certainly after Mr. Kessler submitted the—the permit application as well. But that had no bearing on me approving the permits last year, and denying the permit this year, it's all based on public safety and what we thought we could handle.

(Deposition of Maurice Jones, June 15, 2018 ("Jones Tr.") at 110:12-15, 120:13-121:14).

Mr. Jones also testified that as to groups that might be planning to come to Plaintiff's proposed anniversary event this year, "their message wasn't what concerned me, it was the violence that concerned me, and the public safety issues associated with that violence." (Jones Tr. 108:9-11; see also 21:5-12). He noted that the City had given the Ku Klux Klan a permit for an event in July 2017, even though their message is repugnant to many in the community, because the City did not expect the event to cause a public safety problem. (Jones Tr. 56:12-22). In addition, the Plaintiff himself received a permit for his August 12, 2017 event (later modified as to location) —even though he had just participated in a well-publicized torchlit rally with Richard Spencer (another figure whose political views are anathema to many Charlottesville

2

citizens). (Declaration of Maurice Jones ("Jones Decl.") ¶ 3). On August 7, 2017, the City sought to move Plaintiff's August 12th event to a safer location, only after receiving information the City regarded as credible that a significant public safety threat was imminent. (Jones Tr. 20:12-14; 21:1-12). Tragically, the information, much of which was derived from open-source social media, proved highly accurate. What followed was a civil disorder of a magnitude previously unimaginable to citizens of Charlottesville, with rioting, bloodshed, and death. (Jones Decl. ¶ 5)

This Court has before it the unequivocal testimony of the City official who denied the permit that content or viewpoint discrimination played no part in this decision. In contrast, and notwithstanding his extraordinarily high burden to justify a mandatory preliminary injunction, Plaintiff's Motion for a Preliminary Injunction is remarkably thin. In his Motion, the Plaintiff:

- Offers no evidence of content or viewpoint discrimination in the denial of his permit, providing instead a collection of largely irrelevant news articles and other hearsay;
- Complains about past and anticipated violence from "counterprotestors" both in Charlottesville and elsewhere, without acknowledging his now documented role in provoking, encouraging, welcoming, and celebrating violence;
- Cites a few cases stating general principles of First Amendment law that the City does not question, but that have nothing to do with the facts and circumstances before the City with respect to his permit application;
- Asks the Court to take "judicial notice" of a decision in his case against the City with respect to last year's event, even though that decision was vacated *nunc pro tunc* when Plaintiff chose to voluntarily dismiss the action. (*See Marex Titanic, Inc. v. Wrecked & Abandoned Vessel*, 2 F.3d 544, 547 (4th Cir. 1993)); and
- Fails to even mention three of the four factors on which he has the burden of proof to obtain a preliminary injunction, much less show he meets his burden as to them.

As the City's past history granting permits to highly unpopular speakers demonstrates, it did not take lightly its decision to deny Plaintiff's permit, but rather acted on sincere and documented public safety concerns. To be sure, Plaintiff is careful to assert in public that he does not intend or seek violence, but he also did that last year—even while taking a very

different approach in private settings (such as "members only"–type social media forums) where he thought his tactics would remain undiscovered. *See* pp. 1113, *infra* This year he has again cloaked most of his planning for the proposed event in secrecy, even going so far as to make use of fora where he knows his posts will be automatically deleted within a week or so (even where they are relevant to this litigation). (Deposition of Jason Kessler, on June 27, 2018, ("Kessler Tr.") at 115:7-116:9). The City is not required to take Plaintiff's protestations of peacefulness at face value nor is the City required to turn a blind eye to its prior experience with Plaintiff. *See, e.g., Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 17 (1st Cir. 2004). The City's 2017 experience with Plaintiff (and his "400" invitees), and the information known to the City at this time regarding the imminent threat to public safety posed by this proposed Permit, together provide an extraordinarily cogent evidentiary predicate for denial of a preliminary injunction.

The City was also not required, as Plaintiff seems to suggest, to resolve for him the defects in his application. Plaintiff admits that his application was not consistent with the City's regulations governing park hours, and further admits that he did not take steps to resubmit a conforming application, even though he suggested he would. (Kessler Tr. 226:25-227:5). His permit application sought control over the City's Emancipation Park for 32 hours without any suggestion within his application materials as to his specific plans for all of that time. (Plaintiff's 2017 event proposed a 5-hour rally, which devolved into violence before its scheduled start.) He now suggests in this litigation that he needs the park for only two hours on August 12, 2018, but he never stated that desire to the City within the permit application or review process.

Plaintiff also made no attempt in the permitting process (or in this Court) to address the public safety or responsibility concerns raised in the City's denial. (Jones Decl. ¶12). In 2017, included among Plaintiff's invitees were numerous individuals and organizations renowned for

their willingness and desire to engage in physical combat and paramilitary activity against counterprotestors, as they have done with frequency in other U.S. cities. (Declaration of Wendy Lewis ("Lewis Decl.") ¶ 15). In 2017, Plaintiff eventually published on social media a list of his proposed "speakers" whereas his application for the 2018 anniversary event deliberately omits any programming information, and Plaintiff has been less then forthcoming in discovery about who may be among this year's invitees. In 2017, the City Police Department worked out a plan by which Plaintiff and his attendees were to have reported to a specified entry point, which would allow them access to the park for their event while minimizing contact with counterprotestors. Plaintiff and his attendees never showed up at the designated entry point; instead they undertook an unplanned parade down Market Street, and chaos ensued. (*Id.* ¶¶ 6-13; Jones Decl. ¶ 6). Plaintiff's Motion and discovery responses are devoid of any basis upon which the Court can conclude that he has remedied the threat to life and property to which he and his cohorts contributed through their own actions last year.

The City also acted on the basis of a sincere concern that the Plaintiff lacks the capacity to be responsible for organizing and leading the proposed event. Plaintiff's event last year created an unprecedented public safety crisis in the City that he was wholly unable to handle. He admitted at his deposition that he had been too tied up in other matters to think about security issues, and that he delegated security matters to other persons who were not themselves obligated to comply with the permit or any public safety plan related to the permit. (Kessler Tr. 151:22-25; 152:14-21; 205:14-206:14; Jones Tr. 11:5-10; Lewis Decl. ¶¶ 8-13). One individual to whom Plaintiff delegated "security" was a man named Elliot Kline (alias "Eli Mosley"), a member or former member of an organization called "Identity Evropa". (Identity Evropa was involved in a violent civil disturbance in Berkeley, California in April 2017, subsequently

dubbed the "Battle of Berkeley"). Jack Pierce, another individual to whom Kessler delegated "security" planning, has evaded service of process in this case. Yet Plaintiff also testified that he had no regrets or remorse about last year's event, and that everything that went wrong was someone else's fault. (Kessler Tr. 138:21-139:14). Plaintiff, who in 2017 was initiated via a beating into a violent group referred to as "Proud Boys," *see* Kessler Tr. 245:3-17; Deposition of Brian Lambert, on June 25, 2018 ("Lambert Tr.") at 18:4-15, recently remarked that a violent clash between Proud Boys and others in Portland, Oregon, last month was "entertaining to watch."[2]

The City government has publicly acknowledged that its response to the civil disorder that resulted from Plaintiff's 2017 rally could have been better, and it commissioned an extensive report to offer suggestions on improving its capabilities. (Jones Decl. ¶ 6). The Plaintiff, however, shows no such willingness to change his behavior, leaving no basis upon which the Court may reasonably conclude that his event this year would have an outcome materially different from last year's. *See* p. 14, *infra*. Nor is there anything in Plaintiff's personal or employment history that suggests he has the ability to effectively manage a large-scale significant event, or to organize a peaceable assembly. He has been employed for only two five-month stints in the past seven years, has never held a position of any significant responsibility in any employment situation, and has publicly confessed that when drunk and using Ambien and Xanax he does things he can't remember. (Kessler Tr. 27:25-28:7, 33:4-7, 34:18-35:24, 53:22-54:12, 54:22-55:12, 61:19-62:1, Ex. 13, Ex. 14 at 5). Characteristically, when asked about this Plaintiff blamed his lack of success on others and took no responsibility. (*Id.* 13:4-21; 28:21-29:7; 29:19-25; 62:10-63:1). The City was, and is, not required to take at face value Plaintiff's

---

[2]     *See* https://gab.ai/TheMadDimension/posts/28584386; Kessler Tr. at 68:7-18; 112:23-25 (confirming he posts on gab.ai as "TheMadDimension").

self-serving assertions that he was not responsible for last year's violence and will be able to control this year's event.

Plaintiff also frequents dark corners of the internet, seeking out the attention of extreme and violent individuals and organizations who Plaintiff acknowledges he has no ability to prevent from coming to Charlottesville to attend his event. *See* p. 17, *infra.* He refuses to provide information to the City (or to the Court) as to who he is planning the event with or who is planning to come. *See, e.g.*, Kessler Tr,. Exh. 50, at 2-3. And while he tries to assuage the City's concerns by pointing out how many people are *not* coming to the event this year, the City's concerns are with who *will be* among his attendees if he is granted a permit, as well as Plaintiff's continuing inability to control them. Plaintiff is well aware of, and cheers, recent events in other cities, where individuals and organizations who came to his Charlottesville rally in 2017 seek out opportunities to engage in mutual combat with hated opponents. *See* p. 16-17, *infra.* Time and time again, rallies and demonstrations that are billed as political protests by purveyors of extreme and violent actions degenerate quickly into violence at the slightest verbal provocation. Most recently, only a week ago, the City of Portland, Oregon, had to revoke a permit for such an event after violent confrontations broke out, which included the Proud Boys group in which Plaintiff has been a member. (Lewis Decl. ¶ 15; Kessler Tr. 245:3-246:1, Lambert Tr. 18:4-22). Plaintiff has offered no evidence to counter the City's reasonable judgment that his proposed event poses a similar threat.

The City respectfully submits that Plaintiff's Motion for a Preliminary Injunction should be denied.

## II.    THE FACTS OF RECORD

### A.   Plaintiff Jason Kessler

Plaintiff's political activities in Charlottesville began in December 2016 when he stole a Florida businesswoman's identity and likeness to start a recall campaign. (Kessler Tr. 366:11-368:21, Ex. 52).  At his deposition Plaintiff claimed to be unable to recall if the reports of his deception were true.  (*Id*. 366:23-367:5)  During this recall effort Plaintiff was arrested and convicted for assault and battery of a citizen with whom he got into a disagreement.  (*Id.* 126:24-127:21).  Once charged, he had an arrest warrant issued based on his sworn testimony that the victim had attacked him, but on review of the evidence the Commonwealth's Attorney declined to prosecute and instead referred Plaintiff for a perjury prosecution.  (*Id*. 127:22-128:12). Plaintiff acknowledged at his deposition that his perjury charge was dismissed because the prosecutor failed to establish venue, not because there was insufficient evidence Plaintiff had lied under oath. (*Id*. 128:11-129:13).

As set out in more detail below, Plaintiff's deceptive conduct played a key role in the violence that occurred at his event in Charlottesville last year.  First, while professing peaceful intentions in public, among like-minded individuals Plaintiff was instead secretly encouraging and welcoming violence.  *See* pp. 11-13, *infra*. Second, while purporting to cooperate with the police to secure the safety of his event, he was working with his own private security team, which created security plans that were not shared with the police.  Those private security teams which agreed to plans with the police for security for the event speakers, but then reneged on those plans at the last minute in a way that convinced their police contacts that they never intended to keep their commitments. *See* pp. 13-14, *infra*.

Prior to Plaintiff's recall effort in Florida, Plaintiff had been employed for two five-month stints over a seven year period, and has done some freelance writing. (Kessler Tr. 33:4-7; 34:18-35:24, 44:12-16; 49:12-23; 51:8-17, Ex. 13). When Charlottesville became a focus of white supremacist activity in 2017, however, Plaintiff reinvented himself as a provocateur. An acquaintance who had been involved in some of his activities testified that he believes Plaintiff manufactured "spectacles" around town by, for example, utilizing social media to make inflammatory comments and then announcing his location as a means to provoke others to confront him. (Lambert Tr. 28:17-29:5; 70:16-72:12). Plaintiff provoked one such encounter after being initiated into the Proud Boys, a group recently involved in a riot in Portland along with some of the same groups that were in Charlottesville last year. (Lambert Tr. 70:16-72:12, Lewis Decl. ¶ 15).

Plaintiff's swift rise from chronically unemployed to a recognized leader in the coalition of groups sometimes termed "alt-right" continued in April 2017 when he met Richard Spencer—the man credited with coining that term. (Kessler Tr. 145:4-23). The following month, May 2017, Plaintiff participated in a prominent alt-right event at the University of Virginia, and soon after the May event filed his permit application for the August 12, 2017 event (the "August 12th event" or "2017 event").

### B. Plaintiff's 2017 Event

Following the City's usual procedures, Plaintiff's application for the 2017 event was sent to various City offices responsible for police protection, fire, emergency medical services, street closings, and other related issues, and in late May the City granted Plaintiff a permit for a five hour event with a two hour staging period beginning at 10 AM. (Jones Decl. ¶2). The City relies on the event organizers to provide it with accurate information on the nature of the event,

the planned activities, any special security concerns, and any special equipment or other resources needed. (*Id*.). The City followed the same procedure when it granted the Ku Klux Klan a permit for an event in a local park on July 8, 2017. (Jones Decl. ¶ 4).

The Klan organizer cooperated with the Charlottesville Police Department's plan for ensuring the security of the Klan demonstrators at the event. (*Id*.). There was an agreed upon "staging area" where the police would meet the Klan members and escort them into Justice Park and an agreed upon plan for escorting the Klan out of the park and back to their vehicles. Although the exit plan changed due to counter protestor conduct, the Klan cooperated and no violence occurred between the Klan and counterprotestors. (*Id.*) Plaintiff's complaint states that the Klan event is a model for protection of speakers such as him, but then ignores the fact that Plaintiff and his security personnel did not cooperate with the police as the Klan did.

On August 8, Plaintiff met with the police department, including Capt. Wendy Lewis, to discuss his security needs for the 2017 event. (Lewis Decl. ¶6). Plaintiff also communicated with Capt. Lewis via text about the security plan in the days leading up to the 2017 event (*Id*. ¶2). Moreover, Plaintiff's representatives had several discussions with law enforcement about the details of the security plan for the event. (Jones Tr. at 11:13-23). The agreed upon plan was for police personnel to escort the speakers into the back of Emancipation Park (Declaration of Sgt. Tony Newberry ("Newberry Decl.") ¶6) while attendees would enter the park from the West (Lewis Decl. ¶9). On August 11, Captain Lewis texted Plaintiff that the plan to escort speakers for the 12th was in place, and law enforcement was preparing for the event, and Plaintiff reiterated that Elliot Kline was in charge of security . (Lewis Decl. ¶8, Ex. A).

At the same time, although Plaintiff was stating publicly that he wanted a peaceful event, in private, he was encouraging and enticing attendees to engage in violence. On June 7, 2017,

Plaintiff posted on the "Charlottesville 2.0" Discord server for attendees of the 2017 event: "I recommend you bring picket sign posts, shields and other self-defense implements which can be turned from a free speech tool to a self-defense weapon…" (Kessler Tr. 285:5-10, Ex. 33, at 1) and "[w]e should bring picket signs that can be used as sticks to bludgeon our enemies if they get violent." (*Id.* 296:10-17, Ex. 39). On June 9, 2017, Plaintiff also posted on that server that "[i]f you want a chance to crack some Antifa skulls in self-defense don't open carry. You will scare the shit out of them and they'll just stand off to the side." (Kessler Tr. 296:25-297:6, Ex. 40). Plaintiff also affirmed messages of violence. For instance, he "liked" a message written on Facebook by CJ Ross of the "Virginia Three Percenters"[3] which stated that the "3% groups," will "walk in there [Unite the Right 1] with a thousand men and crush these little c[**]t rags for good." (Kessler Tr. 284:8-285:2, Ex. 32).

More than just promoting and welcoming violence, Plaintiff recruited people for the purpose of serving as "enforcers against Antifa." (Kessler Tr. 278:23-279:11, Ex. 30, at 1). Moreover, Plaintiff called for attendees to become a "highly organized defense against…Antifa" by joining a "shield wall" to be deployed on the day of the Unite the Right 1 Rally. (Kessler Tr. 264:17-265:1, Ex. 26; Lewis Decl. ¶10). Plaintiff also saw violence as a means to "drum up interest" in his event. For example, he encouraged individuals to participate in an event with the

---

[3] The "three percenters" describe themselves as advocating armed resistance to purported restriction of their liberties. *See* https://web.archive.org/web/20171013113529/http://sipseystreetirregulars.blogspot.com/2009/02/what-is-three-percenter.html (visited July 4, 2018). The Fourth Circuit held in *G.G. ex rel. Grimm v. Gloucester City. Schlep. Bd.*, 822 F.3d 709, 725-26 (4th Cir. 2016), *vacated on other ground*s, 137 S. Ct.1239 (2017) that at the preliminary injunction phase of a case proffered evidence should not be "summarily reject[ed]" simply "because it may have been inadmissible at trial," though it also noted that "admissible evidence may be more persuasive than inadmissible evidence in the preliminary injunction context." The City on occasion cites hearsay evidence, but, unlike the Plaintiff, relies here almost entirely on the kind of admissible evidence that the Fourth Circuit has stated may be "more persuasive."

"Proud Boys" in order to "bait Antifa into attacking the Proud Boys" to "drum up interest in Alt-light circles" for the 2017 event. (Kessler Tr. 271:6-13, Ex. 27.)

One of the attendees at Plaintiff's 2017 event, James Fields, is currently being prosecuted for the vehicular homicide of Heather Heyer on the day of Plaintiff's event. Fields was allegedly a member of an organization known as "Vanguard America", and was he dressed in the Vanguard America "uniform" (i.e., white shirts, khakis, and carrying large defensive shields with insignia). Plaintiff observed of Ms. Heyer's death afterwards: "Heather Heyer was a fat, disgusting Communist. Communists have killed 94 million. Looks like it was payback time." (Kessler Tr. 54:1-55:7 & Ex. 14).

Although it was his event, Plaintiff failed to devote sufficient attention to security for it, ultimately failing to comply with a security plan his designated cohorts had agreed on. (Jones Tr. 11:7-10; 20:2-5; Newberry Decl. ¶¶6-8, Lewis Decl. ¶¶6-14). Plaintiff delegated security responsibilities to Elliot Kline and Jack Pierce because he was too "busy on other things and couldn't focus on" it (Kessler Tr. 204:10-20; 205:14-17; 205:23-206:14). Mr. Kline developed a security plan that he circulated to leaders of the 2017 event, including Plaintiff, on August 1. (Kessler Tr., 318:3-8, Ex. 41). Plaintiff did not share this document with law enforcement, however, and does not know if it was ever shared with law enforcement. (*Id*.). Plaintiff now blames Mr. Kline and Mr. Pierce for the security failures at the 2017 event, claiming that Mr. Kline was in charge of and responsible for what was happening on the ground during the rally, and that Mr. Pierce reneged on a security agreement for rally speakers with Sgt. Newberry of CPD. (Kessler Tr. 150:19-21; 152:14-153:5). But Plaintiff himself was the "principal organizer" of the 2017 event (ECF No. 22 at 1), and had himself delegated the key responsibilities to Kline and Pierce.

On the morning of the 2017 event, Plaintiff and his speakers reneged on the security plans they had agreed upon with law enforcement. Plaintiff and the other speakers gathered with some of their attendees in McIntire Park. (Newberry Decl. ¶¶ 7-8). After 9:30 a.m., Sgt. Newberry called Mr. Pierce, pursuant to their arrangement, to inform him that law enforcement could escort the speakers into Emancipation Park. (*Id*.). For the first time, Mr. Pierce told Sgt. Newberry that the speakers would forego the escort. (*Id.* at ¶8, Lewis Decl. ¶12. Within several minutes of this call Sgt. Newberry saw 8-10 large vans each drop off twenty or so demonstrators, many of whom were armed, near the area designated for the speaker drop-offs. (Newberry Decl. ¶8). Sgt. Newberry immediately believed he had been duped by Plaintiff's security personnel, who never had any intention of cooperating with the security plan they had agreed to. (*Id.*). He recalls turning to Det. Braden Kirby at the time and stating, "[t]hey have no intention of this going well." (*Id*.).

Plaintiff's event quickly spiraled out of control as violence erupted in the streets and in Emancipation Park itself. Plaintiff testified that he was not even aware of what was happening on the ground, and that Mr. Kline somehow took the event over from him. Kessler Tr. 150:19-21; 152:14-153:5). Plaintiff acknowledged to Capt. Lewis after the event that she had been "trying to do the right thing and ab[i]de by our original security plan." (Lewis Decl. ¶14 & Exh, B).

In the aftermath of Plaintiff's 2017 event, he admits that even his own associates no longer have confidence in him as a leader of a major event. (Kessler Tr. 53:24-54:10, 224:23-225:2, Ex.14; Lambert Tr. at 58:4-12 ). Despite encouraging and preparing for violence, and actively undermining and allowing others to actively undermine the City's ability to protect the public, Plaintiff has not accepted any responsibility or blame for the massive disorder arising

from his 2017 event.  (Kessler Tr. 138:21-139:14). He chooses instead to blame, among others, the City, the police, the judiciary, Elliot Kline, Jack Pierce, and counter-protestors.  (Kessler Tr. 152:14-153:5; 181:5-9; 193:3-25; 195:4-16; 203:3-11).  Plaintiff was described by a former associate as "callous" to the harm caused by the 2017 event and as having "no regard" for the people who were hurt and no regrets. (Lambert Tr. 58:13-25).

### C.  Plaintiff's 2018 application

Plaintiff filed his application for the 2018 event on November 27, 2017. (ECF No.1 - Exhibit A).  In his application, he estimated that 400 people would attend, but he admits that he pulled that number "out of a hat," just as he had no basis for his estimate of 400 people for the 2017 event.  (Kessler Tr. 178:8-179:1).  The City, on the other hand, had a credible estimate that 1,000 to 1,500 people would attend his event last year. (Lewis Decl. ¶ 3).  In addition to providing the same baseless estimate of a 400-person attendance,  Plaintiff's application for the "anniversary" event, sought a 32 hour permit, but did not provide a list of specified activities or even an agenda. (ECF No. 1 - Exhibit B, Kessler Tr. 188:7-189:6). The City reviewed Plaintiff's application and rejected it citing three categories of reasons.  First, the City denied the application based on public safety concerns, including that the event presents a "danger to public safety" which cannot be accommodated within the area of the City Plaintiff sought utilizing a reasonable amount of city funds and/or police resources, and it "likely underestimates the number of participants."  (ECF No. 1 - Exhibit C; Jones Tr. 34:4-18).  Second, the City noted that it proposed activities beyond those permitted by City regulations—specifically the use of Emancipation Park during hours it is closed for activities.  (Jones Tr. 46:22-47:1).  Third, the application failed to document how the applicant would exercise responsibility for the event and the behavior of the participants.  (Jones Tr. 48:10-19).

Rather than address the City's concerns, Plaintiff had his attorney write Acting City Attorney Lisa Robertson to demand a permit for the 2018 event on unspecified terms and conditions. (ECF No. 1 - Exhibit D at 2). The letter erroneously stated that Plaintiff had amended his application to match Emancipation Park's operating hours, *id.*, but Plaintiff did not do so. (Jones Tr. 48:8-9; Kessler Tr. 227:2-4; ECF No. 22 at 4 ("it is technically true that Mr. Kessler did not file an amended application"). Moreover, the letter did not address the City's concerns about public safety or the absence of a responsible party. (ECF No. 1 - Exhibit D at 2; Jones Decl. ¶12). Since the letter provided no new information and did not address the City's concerns about the public safety risks the event posed or the absence of a party responsible for the behavior of the event's attendees, Ms. Robertson referred Plaintiff's counsel to the City's denial letter and its event permitting regulations. (ECF No. 1 - Exhibit D at 3).

Plaintiff then filed this action against the City and City Manager Jones. Despite the already short amount of time between the filing and August 11 and 12, Plaintiff delayed serving the City and Mr. Jones for six weeks for reasons Mr. Kessler was unable to explain. (Kessler Tr. 58:25-59:6). Notwithstanding Defendants' good faith efforts to expedite the suit the short time remaining would significantly impair the City's efforts to prepare for Plaintiff's event were relief to be granted. (Jones Dec. ¶12).

### D. Plaintiff's 2018 Event

Plaintiff still has not provided the City with the details it would need to ensure that his event can be conducted safely, if the City were required to grant him a permit. For example, Plaintiff refuses to provide the City with information about which individuals and organizations are attending the event. Plaintiff has been planning the event with a group of individuals and is using social media and communication applications to do so, including applications that erase

their messages. (Kessler Tr. 115:15-116:12). In response to the City's discovery requests, Plaintiff listed the names of six speakers. (Kessler Tr. 343:10-17, Ex. 50).[4] Despite claiming to be interested in organizing a peaceful event, Plaintiff has continued to applaud violence, just as he has in the past. Within the last month Plaintiff delighted in the violence at a rally in Portland.[5] These continuing statements celebrating violence between groups that support and oppose him signal that similar violent clashes are expected and welcomed at UTR2.

In addition to lauding violence, Plaintiff continues to attract attention from extreme figures with documented histories of violence. Plaintiff is aware that hundreds of individuals on Facebook have stated that they want Atomwaffen Division ("AWD"), an extremist group whose members have been charged with murder and other violent crimes, to provide security for Plaintiff's proposed 2018 event. (Kessler Tr. 285:12-287:15; 289:3-6, 290:8-13, Ex. 34, Ex. 35). Plaintiff also knows that people interested in his event are discussing inviting another violent group known as Rise Above Movement. (Kessler Tr. 289:10-14, 290:8-291:2, Ex. 35, Ex. 36). Plaintiff invited further (secret) communication with an individual who said he wanted to recruit 198 fighting men for the event. (Deposition of March Boechat on June 29, 2018, Rough Transcript, ("Boechat Rough Tr.") 28:19-23; 29:19-23; 31:19-25). This individual testified that he and others are frustrated with the state of the country, and that when frustrated may get violent. (Boechat Rough Tr. 27:16-28:13).[6] Despite the violence that occurred at the 2017 event and the interest Plaintiff's proposed 2018 event is attracting among violent groups and

---

[4]    It is not clear that this list of speakers is complete or final. Plaintiff recently produced a document disclosing that a previously confirmed speaker has cancelled. Declaration of Linda Odom, Ex. E.

[5]    *See* https://gab.ai/TheMadDimension/posts/28584386; Kessler Tr. 68:7-18; 112:23-25 (confirming he posts on gab.ai as "TheMadDimension").

[6]    Plaintiff falsely swore under oath that he had no communication with Mr. Boechat about UTR2. *See* Kessler Tr. Ex 50, at 2).

individuals with violent inclinations, Plaintiff maintains that he has no control over who attends

his event, that he is not responsible for them or their actions. (Kessler Tr. 288:1-24).

Throughout the country, there is a pattern of violence in events like the one Plaintiff

demands the court allow him to organize. From Berkeley to Portland to Charlottesville, these

events attract people interested in engaging in combat and other violence, rather than discourse,

(Lewis Decl. ¶15) and Plaintiff has been following these conflicts. (Lambert Tr. 65:25-66:6,

Kessler Tr. 291:14-20). Plaintiff has asked this court for an extreme remedy so he can organize a

nearly identical event to the violent and damaging event he held last year, despite the interest

violent groups and individuals have in this event, and his inability to address any of Defendants'

concerns.

## III.   THE PLAINTIFF HAS NOT MET HIS EXTRAORDINARY BURDEN OF SHOWING ENTITLEMENT TO A PRELIMINARY INJUNCTION

### A.   The Mandatory Preliminary Injunctive Relief Plaintiff Seeks Is Subject To An Extraordinarily High Burden

"A preliminary injunction is an extraordinary remedy intended to protect the status

quo and prevent irreparable harm during the pendency of a lawsuit." *Di Biase v. SPX Corp.*, 872

F.3d 224, 230 (4th Cir. 2017). "A preliminary injunction shall be granted *only* if the moving

party *clearly* establishes entitlement to the relief sought. *Id.* (emphasis added) (citing *Fed.

Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 499 (4th Cir. 1981). The grant of a

preliminary injunction involves "the exercise of a very far-reaching power, which is to be

applied only in [the] limited circumstances which clearly demand it." *Centro Tepeyac v.

Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013) (*en banc*) (internal citation and quotation

marks omitted). And as the Supreme Court has cautioned, this extraordinary remedy is "never

awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also*

*id.* at 32 (noting that issuance of an injunction even after trial "is a matter of equitable discretion; it does not follow from success on the merits as a matter of right.").

Although the primary purpose of the extraordinary remedy of a preliminary injunction is to protect the status quo, a remedy known as a "prohibitory" injunction, courts do on occasion issue "mandatory" injunctions that alter the status quo. *See, e.g., League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 235-36 (4th Cir. 2014) (quoting *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013)). The Court's application of the standard of review "is even more searching" for a mandatory, rather than prohibitory, injunction. *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003)). A mandatory injunction "in any circumstance is disfavored," s*ee Taylor v. Freeman*, 34 F.3d 266, 270 n. 2 (4th Cir. 1994), and is "warranted only in the most extraordinary circumstances." *Id.* (citing *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980)). This Court has stated on multiple occasions that a mandatory injunction in any circumstance is disfavored. *See, e.g., Trex Company, Inc. v. CPG Int'l LLC*, 2017 WL 3272013, at *9 (W.D. Va. 2017) (internal quotations omitted); *Volvo Group North America, LLC v. Truck Enterprises, Inc.*, 2016 WL 1479687, at *6 (W.D. Va. 2016) (internal quotations omitted). If a motion for preliminary injunction is construed as mandatory, the plaintiff "must show that the 'law and facts *clearly favor* [its] position, not simply that [it] is likely to succeed.'" *Dynamic Aviation Group Inc. v. Dynamic Int'l Airways, LLC*, 2016 WL 1247220, at *5 n. 3 (W.D. Va. 2016) (emphasis in original) (quoting *Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th Cir. 2015)).

In this case, Plaintiff in no way seeks to maintain or protect the status quo. The status quo is that Plaintiff was denied a permit in December 2017, and then proceeded to sit on his hands for three months, during which he declined to seek any administrative appeal, amend his

application or otherwise provide additional information to the City. Even after he filed a lawsuit, Plaintiff waited an additional six weeks after that before commencing this action by serving process upon the City in April 2018. Plaintiff himself has testified that if this Court does not disturb this status quo he will abide by the City's determination, and pursue his permit in Washington, D.C. where he has already received an initial approval for the same dates, and will not proceed in Charlottesville. (Kessler Tr. 305:1-17). Should the status quo be disturbed by the requested relief, however, the City will be placed under a court order to allow an event to proceed under circumstances that will inevitably result in the same violent disorder as Plaintiff's 2017 event. Under such circumstances, the burden on a party seeking the "extraordinary remedy" of a preliminary injunction is at its highest.

To be granted a preliminary injunction, the moving party must demonstrate that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20 (2008). Again, the relief cannot be granted lightly, *see Centro Tepeyac*, 722 F.3d at 188, and is never a matter of right. *Winter*, 555 U.S. at 24, 32.

### B. Plaintiff Has Not Attempted To, And Cannot, Meet Three Of The Factors Necessary To A Preliminary Injunction

#### 1. Plaintiff Has Failed To Address Three Of The Four Factors Assessed In Determining If A Preliminary Injunction Should Be Granted

Plaintiff's memorandum in support of his motion for a preliminary injunction addresses only the factor of likelihood of success on the merits, and entirely ignores the other three factors a plaintiff must show to obtain a preliminary injunction: irreparable harm, a balance of the equities in his favor, and the public interest. Plaintiff's failure to address any of these elements means that he cannot meet his burden of showing that all four elements are met. *See Direx*

*Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (moving party "bears the burden of establishing that *each* of these factors supports granting the injunction.") (emphasis added; internal citation omitted); *Doe v. Pittsylvania Cnty.*, 842 F. Supp. 2d 927, 930 (W.D. Va. 2012) (preliminary injunction cannot be granted unless "*all four* of these elements are met.") (emphasis added).

By failing to address these matters in his opening memorandum, Plaintiff has also waived any right to argue them on reply, because "[g]enerally, a reviewing court will not consider arguments that are raised for the first time in a reply brief." *Lismont v. Alexander Binzel Corp.*, 2014 WL 12527239, at *1 (E.D. Va. 2014) (internal quotations and citation omitted). Plaintiff thus cannot meet his burden of showing his entitlement to a preliminary injunction.

While the factors Plaintiff has disregarded have sometimes been presumed from a meritorious First Amendment claim, *see, e.g. Centro Tepeyac*, 722 F.3d at 190-91, an injunction never follows as of right on any claim, even if it is successful. *Winter*, 555 U.S. at 24, 32. Defendants have not found any case where a Plaintiff ignored the irreparable harm and discretionary factors necessary to the grant a preliminary injunction, and *Winter* squarely precludes that result. Plaintiff's motion thus fails on this ground alone.

## 2. The Three Preliminary Injunction Factors Plaintiff Has Disregarded Require Denial Of Relief In Any Event

Where as here, a municipality demonstrates legitimate public safety concerns, courts have denied preliminary injunctive relief after weighing the relative harms and the public interest. *See Tracy Rifle and Pistol LLC v. Harris*, 118 F.Supp.3d 1182 (E.D. Cal. 2015)(denying a motion for preliminary injunction against a California law restricting certain on premise advertisements by gun retailers, despite finding that movant was likely to win on the merits, because the public interest and balance of the equities favored denial). B*l(a)ck Tea Soc'y*

*v. City of Boston*, *supra*, presents an example closely relevant to this case. Denying a preliminary injunction in a challenge to restrictions placed on demonstrators at a political convention, the court held that these factors favored the municipality imposing the restrictions:

> A burden on protected speech always causes some degree of irreparable harm. *See Elrod v. Burns,* 427 U.S. 347, 373-74 (1976). Here, however, the safety, security, and logistical concerns voiced by the City were real, and the district court was correct in giving those concerns due consideration. Thus, the balance of harms is inconclusive in this case. Similarly, the public interest cuts both ways. On the one hand, freedom of expression, especially freedom of political expression, is vital to the health of our democracy. On the other hand, making public safety a reality and ensuring that important political events are able to proceed normally are also valuable. Moreover, a determination of the public interest necessarily encompasses the practical effects of granting or denying preliminary injunctive relief.

378 F.3d at 17.

The balance of the harms and the public interest in this case likewise favor the City. The "safety, security, and logistical concerns" demonstrated by the City here are very real. They include not only the substantial evidence before the City at the time of the permit denial that granting the Plaintiff a permit for 32 hours to reprise an event that under his leadership last year led to massive public disorder would threaten public safety, even with a massive commitment of public resources, but the information that has been gathered since the denial about the Plaintiff's plans for the new event. He is the sole (disclosed) organizer of the rally and is largely planning the rally in secret by email, an encrypted messaging app (Signal), and on website private chat areas that do not save posts or comments for longer than a week and that draw violent and extreme users, many banned from platforms such as Twitter. He has taken no responsibility for the events of last year and is not planning to do anything differently. Any harm to Plaintiff from the permit denial is far outweighed by the harm to the City if the permit is issued.

The public interest also weighs strongly in the City's favor, which allows the Court to take into account the "practical effects of granting or denying preliminary injunctive relief," *Bl(a)ck Tea Soc'y*, 387 F.3d at 17, as the City did in determining to deny the application. While Plaintiff's permit for a 32 hour use of the Park over a weekend was denied, and thus his First Amendment rights limited, the City had every right to take into account all circumstances that might reasonably arise if the permit application was granted including: (1) further economic losses by downtown City businesses due to the area being perceived as unsafe, hostile or otherwise undesirable; (2) further disruption to area businesses and residents; (3) further harm to the City's reputation if the demonstration once again devolved into violence; and (4) economic harm to City government due to the manpower and other resources required for the event.

In sum, even if this Court found some reason to overlook Plaintiff's failure to address three of the four factors on which he must prevail to obtain preliminary injunction, consideration of those factors would require denial of the injunction in any event.

C.     **Plaintiff Has No Likelihood Of Succeeding On The Merits**

1.     **Plaintiff Has Provided No Evidence That His Permit Was Denied Based On The Content Of His Speech**

As set out above, the permit for the Plaintiff's proposed "UTR2" rally was denied based on the City's justified and legitimate concerns about the significant public safety issues raised by his proposed event and about his ability to manage and be responsible for such an event. Plaintiff also admittedly failed to present a proper application because it sought a permit for hours the Park is closed. City Manager Jones, who made the denial decision, testified unequivocally that expected hostility to Mr. Kessler's message played no part in his decision, and that he made his decision on public safety and responsibility grounds without regard to

political pressure. (Jones Tr. at 110:12-15; 121:4-14). Mr. Jones' testimony is not credibly challenged by anything in the Plaintiff's submissions.

Plaintiff asserts that "City elected officials" are "mostly, or entirely" opposed to his "free speech activity," but cites only to his own declaration, which in turn cites only to some news articles and other hearsay sources that cite persons he has not shown had anything to do with his permit denial. Pl. Mem. at 5 & n.16. Plaintiff does not even attempt to explain how this material, which includes statements from the former Mayor and Vice Mayor who are no longer in their previous offices and had no involvement in the decision at issue here (Jones Decl. ¶9), support his claim. Mr. Jones also testified unequivocally that no member of the City Council had any involvement or even offered any guidance on his decision, and that it was his and not the Council's. (Jones Tr. 45:21-24; 46:1-7, 87:19-23). This testimony is not contradicted anywhere in the record.[7]

Unable to muster any evidence to meet his burden of showing that the City's decision to deny his permit was based on the content of his speech or any form of viewpoint discrimination, Plaintiff attempts to shift the burden onto the City of rebutting a "finding of this Court" as to content discrimination with respect to his "UTR1" rally last August, even going so far as to direct the Court to take "judicial notice" of that litigation. Pl. Mem. at 5 & n.1. The request is inappropriate and the City has no such burden. Plaintiff's decision to unilaterally and voluntarily dismiss his UTR1 action under Fed. R. Civ. P. 41(a)(1)(i) operated as a matter of law "leave the parties as if no action had been brought at all," and thus "carrie[d] down with it previous proceedings and orders in the action, and all pleadings, both of plaintiff and defendant, and all issues, with respect to plaintiff's claim." *Marex Titanic*, 2 F.3d at 547 (quoting *Dove v.*

---

[7]     Plaintiff also ignores the City's denial of other permits at the same time from persons who do not share the Plaintiff's views. (Jones Decl. ¶¶ 10-11.)

*CODESCO*, 569 F.2d 807, 809 n. 3 (4th Cir.1978) and citing *In re Piper Aircraft Distrib. Sys. Antitrust Litig.*, 551 F.2d 213, 219 (8th Cir. 1977)). Plaintiff's attempts to piggyback his claims onto last year's litigation are thus futile, and his failure to provide any evidence that the City's decision this year was based on the content of his speech is fatal to his claim.[8]

Although the City does not wish to re-litigate a matter that is now a legal nullity, the Plaintiff's almost exclusive reliance on the City's decision-making from last year to support his claim this year warrants comment. As set out above, the City's grant of permits to the Ku Klux Klan and to the Plaintiff himself last year demonstrate that, absent legitimate public safety concerns, it will grant event permits to applicants with views repugnant to those of many if not most of its citizens. Mr. Jones testified, even where there is political pressure to deny such permits "my response was we protect the First Amendment," and "we encourage First Amendment activities within our community, absolutely." (Jones Tr. 114:13-22, 119:9-10).

The City amended the Plaintiff's permit last year to require a safer location only after a "cumulative body of intelligence collected by the CPD" raised serious public safety concerns, concerns which proved to have a substantial basis. (Jones Decl. ¶ 5). Judge Conrad's ruling last year, which again has no current legal existence or effect, was made of necessity on an expedited basis, and in the context of a sensitive and close judgment even within the City itself as to whether moving the event so close to the time of the event would promote or hinder safety. (*Id.*; Jones Tr. 114:18-115:2 (noting the differing views); (Lewis Decl. ¶5)(noting her agreement to the move). The City has far more evidence and experience now, including the events of last year of the Plaintiff's own role in encouraging and welcoming violence despite his public protestations to the contrary. Based on that evidence, experience, and a review of City resources

---

[8] Plaintiff makes no attempt to argue that the City's decision is invalid under the standards that apply when no viewpoint discrimination or content-based regulation is shown.

and preparedness for 32 hours of demonstration and related activities, Mr. Jones concluded that the permit should be denied.

In making his decision, Mr. Jones was fully aware that many in the community, including some members of the City government and the City Council, have objections to Plaintiffs opinions, but he did not base his decision on that. (Jones Tr. 45:7-13, 120:13-121:14.). City officials and citizens of course have the same right as the Plaintiff to express their views on the subjects he claims underlie his event, and contrary to Plaintiff's suggestion such statements do not establish viewpoint discrimination where not tied in any way to the decision on his permit, much less give him the right to hold an event that the City has determined would endanger public safety.

### 2. The Case Law Plaintiff Cites Provides No Support For His Position

Plaintiff's legal discussion, which is less than a page long, consists of a heading and a first paragraph that are cut and pasted from the motion he filed last year, the wholly unsupported assertions of viewpoint discrimination discussed above, a couple cases about the heckler's veto, and another case cited for the proposition that a permit cannot be denied on the basis of the content of speech. Pl. Mem. at 5-6. Since the City's decision was not based on the content of his speech, and since the City's public safety concerns arose from the Plaintiff's own actions and conduct and its experience with his 2017 event, and not merely the actions of counterprotestors opposed to his message, none of this legal authority supports his motion.

Since it is obvious that the Plaintiff copied legal discussion from his brief of last year, it is instructive to see what he chose to omit from that brief. Most notably, last year the centerpiece of Plaintiff's argument was a claim of viewpoint discrimination based on the City's modification of Plaintiff's permit, while it allowed counter protesters to remain at the parks where they had

been initially permitted.[9] The evidence is undisputed this year that the City has not granted some permits while denying others. (Jones Decl. ¶¶10-11). Similarly, last year's brief was careful to note that a "heckler's veto" is not involved where there is a threat of violence from the plaintiff himself, and not merely from others who oppose his message.[10] No doubt aware of the substantial evidence in the record that Plaintiff himself invited and welcomed violence, his papers do not bring that legal principle to the Court's attention. Similarly, last year while Plaintiff was maintaining peaceful intentions in public while secretly planning for and encouraging violence, his arguments to the court asserted that there was no evidence supporting the City's concern that large crowds would attend and create a danger to public order and safety, and cited the principle that "unfounded speculation about potential violence cannot justify an insufficiently tailored restriction on expression."[11] In contrast, this year Plaintiff's once-secret conduct has come to light, and the City's public safety concerns have proven anything but "unfounded speculation."

Plaintiff also makes no effort to discuss the facts of the cases on which he does rely; a further demonstration that they provide no support for his position, and in fact support the City's. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015), which struck down as not content-neutral a municipal regulation that subjected signs to different restrictions based on the information they conveyed, provides perhaps the starkest example. Unlike *Town of Gilbert*, the City here is not addressing or regulating the content of Plaintiff's signs or anyone else's. To the contrary, the City is concerned about numerous examples of Plaintiff promoting violence, including a post

---

[9] *See* ECF #6, No. 3:17-cv-00056, at 5-6 (arguing that this "makes clear" that the decision was "based on the content of his speech rather than on other neutral factors").

[10] *Id*. at 8 (citing *Christian Knights of Ku Klux Klan v. Stuart*, 934 F.2d 318 (4th Cir.1991)).

[11] *Id*. at 6-7 (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d at 17).

where he urges that his attendees bring "picket signs that can be used to bludgeon our enemies." (Kessler Tr. 285:5-10, Ex. 33 at 2). Plaintiff is interested in signs for their potential use as weapons, not as elements of expression. *Lefemine v. Wideman*, 672 F. 3d 292, 299 n.3 (4th Cir. 2012), which held it was improper to threaten a breach of the peace prosecution for carrying large graphic signs of aborted fetuses, is distinguishable on the same basis.

Plaintiff's reliance on *Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir. 1985), is likewise misplaced. That case held that "artistic expression" (performance in blackface) that some found offensive could not be restricted where the defendant police department could not show any internal disruption or strained relationships with citizens. Here, by contrast the City's concerns are documented and far more serious than "strained relationships." *Berger* also notes that the First Amendment does not protect "direct incitements to violence." *Id.* *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 295 (1984), the only other last case on which Plaintiff relies on this point, upheld as content neutral federal regulations that forbid sleeping in the park. Plaintiffs' motion is thus as lacking in legal support as factual support.

### 3. Even If Plaintiff Had Properly Alleged And Supported His Claim Of A First Amendment Violation, Which He Has Not, The City's Determination Was Reasonable Restriction Of Speech

#### a. The City properly denied the permit application as presenting a danger to public safety that could not be accommodated within the area applied for or with a reasonable expenditure of City funds and/or police, fire and emergency medical response resources

As set out above, Plaintiff's application provided the same unsupported estimate of crowd size as his application for the August 2017 event, with the same overall lack of structure. In two ways, however, it presented an even greater public safety challenge. First, it sought to reserve the Park for a full 32 hours – the equivalent of four full police and emergency responder shifts–rather than seven hours as for last year's event, which can be covered in a single shift.

(Jones Decl. ¶8). Second, the Plaintiff did not address in his permit application any of the public safety issues raised by his prior event, other than to implicitly blame the City for them (the requested rally was in part to protest "government … failure to follow security plans for political dissidents) and to demand efforts on the part of the City to allow the protestors to enter the Park "without threat of violence." (Kessler Tr. 186:16-21, Ex. 18).

The application raised public safety and resource concerns on its face, even apart from its reference to violence and its refusal to address the critical public safety issues that resulted from Plaintiff's prior event. Rather than offer a coherent and workable program, it sought to reserve the Park for a full 32 hours, including outside normal park hours, with no specified activities. It presented no agenda, no description of the events that would occur, and no explanation as to why 32 hours were needed. The City reasonably determined that the application presented an unreasonable danger to public safety and would require an unreasonable expenditure of public resources. (Jones Decl. ¶8, 12). Faced with the denial, the Plaintiff made no effort to address any of the concerns the City communicated in its denial letter, other than his offer to amend his already denied application to abide by unspecified "standard hours of operation." *See Yates v Norwood*, 841 F. Supp. 2d 934, 942 (E.D. Va. 2012) (upholding city's authority to deny a permit based on one or more of the reasons set forth in the ordinance and holding that "decisions concerning the resources required to maintain order and safety under varying circumstances necessarily call[s] for the exercise of discretion based on law enforcement expertise and familiarity with the potential dangers facing a locality.").

The City's' decision was also properly informed by its prior experience with the Plaintiff. At his deposition, Plaintiff did not question the City's ability to take this prior experience into account, and to the contrary repeatedly asserted that the City can and should take into account

the prior activities of persons protesting his activities. (Kessler Tr. 214:14-25). The case law confirms the propriety of the City's consideration of the Plaintiff's prior event and his role in it.

*Bl(a)ck Tea Soc'y v. City of Boston*, *supra,* affirmed the denial of a preliminary injunction sought by the demonstrators at a political convention to overturn restrictions based in part on "recent past experience with large demonstrations." Although there was "no evidence in the record that the City had information indicating that demonstrators intended to use such tactics" in the current demonstration, the court held that the city properly took the past experience into account and "most assuredly can" make use of past experience as long as the "inferences drawn from past experience are plausible."

As set out more fully above, Plaintiff's prior event created an unprecedented public safety situation. While Plaintiff has sought to blame the problems entirely on others, evidence collected by the City and outlined here, which City Manager Jones testified he relied on in making his decision (Jones Tr. 29:19-25), demonstrates that Plaintiff bore substantial responsibility for the situation by failing to supervise his security operation, which then did not cooperate with law enforcement, and by encouraging and welcoming violence in the event planning. *See pp.* 12-14, *supra.* The plan that Plaintiff failed to follow was similar to that used by police to manage the Klan event, and Plaintiff's failure to abide by the plan and with police requests significantly hampered the police's ability to manage the August 12, 2017 event. (Lewis Decl. ¶ 13, Jones Decl. ¶ 6). Indeed, Plaintiff's responsibility for the violence is still being litigated in at least two ongoing lawsuits: one in this Court, *Sines v. Kessler*, No. 3:17cv-00072 (W.D. Va. 2017), and one in state court, *City of Charlottesville v. Pennsylvania Lightfoot Militia*, No. 1700056-00 (Va. Cir. Ct. Charlottesville 2017).

*United for Peace and Justice (UPJ) v. City of New York*, 243 F.Supp.2d 19 (S.D.N.Y. 2003) upheld the denial of a permit for a protest based on the lack of information it had about the event, the large and uncertain number of participants, and its inability to appropriately plan for adequate security. In denying an injunction to allow the march, the court found that the City's concerns about security were a legitimate exercise of its interest in maintaining public safety. The court noted that "police concerns about security threats posed for the United Nations are far from theoretical," citing two previous instances of security breaches. The decision amply supports the City's reliance on Plaintiff's history here, which also raises concerns that are "far from theoretical" given events at last year's rally.

The *UPJ* court also rejected the argument that the city's actions were invalid "because other parades of large size are permitted by the city." Those cases involved annual parades where the city had a "firm notion of turnout based on past attendance records." Plaintiff's proposed event provides no such "firm notion" of turnout by the organizations Plaintiff is soliciting on social media to attend, largely in secret. All of this supports the City's determination here to deny the permit. *UPJ* also held that the city properly relied on the permit applicant's failure to provide the names of other organizers and the changing numbers of expected attendees; the City's similar concerns here are amplified by Plaintiff's activities in dark corners of the internet frequented by violent extremists offering him support. The City properly rejected the permit on this ground.

b.   **The City Acted On The Basis Of A Legitimate Concern That Plaintiff Could Not Properly Exercise Responsibility For The Event**

The City denied the permit on the separate ground that Plaintiff had not shown that he could properly exercise responsibility for the event. As set out above, Plaintiff bore significant responsibility for the disastrous results of the event for which he was the "principal organizer"

last year, including his failure and that of his security team to abide by security arrangements with the police and his failure to maintain control of an event to which he invited groups involved in extreme and violent activity whom he urged to provoke and engage in violence.

In making this determination, the City was not imposing some kind of "responsibility" test for exercising First Amendment rights. Plaintiff is free to advocate for "white civil rights" and to protest the City's actions with respect to the statue in Emancipation Park at any time. The City was evaluating the Plaintiff's application exactly as he chose to present it, to reprise his role as, in essence, the executive producer and promoter of a two-day event designed to draw extremists who intend to engage in violence and hoping to be provoked into it. Plaintiff admits he has no control over who may take him up on his offer to reprise last year's event. (Kessler Tr. 288:1-24). The City's prior experience with the Plaintiff, and Plaintiff's own background, demonstrate that allowing him to serve again this role presented a significant threat to public order. The City was entitled to take this history into account, *see Bl(a)ck Tea Party,* 378 F.3d at 17, and to make a reasonable determination to protect public health, safety, or welfare. *See Yates*, 841 F. Supp. 2d at 942.

Other than to repeat protestations of his nonviolent intent that proved deceptive last year, Plaintiff has offered no evidence, either in the application process or otherwise, sufficient to persuade the City that the outcome of his event this year would be any different, much less to allow this Court to overturn the City's judgment on the matter. To the contrary, Plaintiff has asserted that he did nothing wrong and has no regrets, and has reiterated his distrust of the City, the police, and the legal and judicial system. (Kessler Tr. 138:10-139:14, 181:5-9; 231:13-24). The City properly determined that it would be irresponsible to permit Plaintiff to reprise his role from last year.

### c. The City Properly Determined that Plaintiff's Application Was Deficient

Plaintiff concedes that it is "technically" true that he did not properly amend his permit application to comply with normal park hours. (Pl. Mem. at 4,   Kessler Tr. 226:24-227:5).  The City was entitled to consider Plaintiff's actual application, which sought a 32 hour permit, as it was filed, and not in the myriad of ways Plaintiff could theoretically modify it.  Plaintiff's approach of seeking a permit without providing necessary information as to hours, agenda, planning, public safety concerns, and his own fitness to serve as the City's only official contact for purposes of making and complying with a safety plan, does not present a workable way to consider permit applicants, particularly given the history of Plaintiff and his event.  *See Cox v. City of Charleston*, 416 F.3d 281, 284 (4th Cir.2005) (City may "set[] forth regulations and ordinances requiring advance parade permits as a traditional exercise of control by the local government").  Plaintiff could have properly submitted an amended application, just as he could have addressed the City's other concerns, but chose instead to repair to this Court, with significant and unexplained delays.  The City was entitled to deny the permit.

### CONCLUSION

The motion for a preliminary injunction should be denied.

/s/ Linda Odom
Linda Odom (VSB No. 77149)
John Longstreth (*pro hac vice*)
Daniel S. Cohen (VSB No. 92163)
**K&L Gates LLP**
1601 K St. NW
Washington, D.C. 20006
Tel: (202) 778 -9000
Fax: (202) 778 -9100
Email: linda.odom@klgates.com
          john.longstreth@klgates.com
          dan.cohen@klgates.com

Lisa A. Robertson
Chief Deputy and Acting City Attorney (VSB No. 32486)
Sebastian Waisman (VSB No. 91665)
**Office of the City Attorney**
P.O. Box 911
Charlottesville, VA 22902
Tel: (434) 970-3131
Fax: (434) 970-3022
Email: robertsonl@charlottesville.org
           waismans@charlottesville.org

*Counsel for Defendants*

July 6, 2018

**CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2018, the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing (NEF) to counsel of record in this matter.


/s/ Linda Odom⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽