UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| JASON KESSLER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:18-cv-00015-NKM-JCH |
| | ) | |
| CITY OF CHARLOTTESVILLE | ) | |
| MAURICE JONES | ) | |
| Charlottesville City Manager | ) | |
| In his individual and official capacities | ) | |
| | ) | |
| Defendants. | ) | |

_____

## **DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Defendants, City of Charlottesville ("City") and Maurice Jones, through undersigned

counsel, pursuant to this Court's Order of July 20, 2018 (ECF No. 61, (PAGE ID # 1041)) in

advance of the hearing on Plaintiff's motion for a preliminary injunction file the proposed

findings of fact with citations either to the record or to anticipated testimony and evidence that

will be presented at the hearing, and proposed conclusions of law.  Plaintiff's motion seeks an

order requiring the City and its City Manager to grant Plaintiff a permit for an event that he has

termed "Unite the Right 2," or "UTR2."   Plaintiff describes his proposed event as

"memorializing" the anniversary of the "Unite the Right 1," or "UTR1," event he organized in

August of last year, *see* ECF No. 1-3 at 2 (PAGE ID# 16), Kessler Depo., Ex. A[1] at 100 (ECF

No. 31-4, at 129 (PAGE ID# 725)), which led to civil disorder of a magnitude previously

unimaginable to citizens of Charlottesville, with rioting, bloodshed, and death.  Jones Decl., Ex.

B at 2 (ECF No. 31-1 at 2 (PAGE ID# 581)).

_____

[1]        For the Court's convenience, Defendants' are attaching hereto copies of documentary
evidence supporting their Opposition to Plaintiff's Motion for Preliminary Injunction.  Parallel
citations to the electronic record are included where available.

Defendants respectfully submit that Plaintiff has entirely failed to carry his heavy burden of showing his clear entitlement to a preliminary injunction, and that the motion must be denied.

## I.     PROPOSED  FINDINGS OF FACT

Defendants offer two preliminary observations.

First, we note that while the Court need not rely only on undisputed facts of record as if this were a motion for summary judgment, virtually all of the evidentiary material that Defendants have filed in opposition to Plaintiff's motion remains entirely unrebutted in any manner by the Plaintiff. Plaintiff's motion was supported only by a declaration from the Plaintiff himself providing an odd collection mostly of newspaper articles and social media postings, virtually none of which had any relevance to the permit denial at issue in this case. Defendants responded with extensive evidentiary material including deposition testimony of the Plaintiff, of the decision maker on the permit, City Manager Maurice Jones, and of third party witnesses, and with extensive documentary evidence properly authenticated and testified to under oath. Plaintiff in reply has attempted to take issue with only certain minor aspects of this evidence, and otherwise has instead relied almost entirely on the argument that a consent decree in another case somehow acts as *res judicata* in this one.  *See* Pl. Sur-Reply, ECF No. 62, at 1-2 (PAGE ID#s 1042-43); Pl. Reply, ECF No. 42 (PAGE ID#s 926-29) (mentioning the decree ten times in its 3 1/2 pages). Plaintiff also provided some out of context pages of Mr. Jones' deposition in an effort to provide the Court a misleading impression of his testimony, (Pl. Reply, ECF No. 42-1, at 12-17 (PAGE ID#s 941-46)), and a supposed disavowal of a dark-web denizen who queried individuals on the internet whether the violent extremist group known as Atomwaffen should provide security for Plaintiff's proposed UTR2 event, *id.* at 18-19 (PAGE ID#s 947-48), which is also highly misleading, as discussed at 13, 33.a, 66-67.

2

Second, Defendants note that, despite their efforts to obtain prompt discovery in this case, as contemplated by the Court's May 7 initial scheduling order referring to "expedited discovery," ECF No. 10 at 2 (PAGE ID# 47), Plaintiff's repeated noncompliance with his discovery obligations has prevented Defendants from presenting a full picture of his activities. The specific discovery issues were laid out in proceedings before Judge Hoppe, who issued an order compelling Plaintiff to comply with his discovery obligations; Plaintiff has not yet complied with the most substantial portions of that order.

In brief, Plaintiff testified first that he was not even informed of Defendants' outstanding discovery requests until after they were due (Kessler Depo., Ex. A at 75 (ECF No. 25-6 at 5 (PAGE ID# 448)), and that he pulled together his response in one day with a no apparent direction from counsel, deciding for example that he did not have to produce anything that Defendants could supposedly find on their own. Kessler Depo., Ex. A at 71 (ECF No. 25-6 at 4, 5, 12, 15 (PAGE ID#s 447-48, 455, 458). Next, Plaintiff testified that he had made no effort to preserve his communications on social media or elsewhere about his UTR2 planning or other matters relevant to the litigation until he started to pull together his responses—after they were due. Instead Plaintiff purposefully conducted those communications on sites where he had set his posts to be deleted after 7 days (Kessler Depo., Ex. A at 114-15 (ECF No. 25-6 at 12-13 (PAGE ID#s 455-56)), meaning that, for example, Defendants received no posts made before June 13, 2018 on the "Signal" media site he was using at the time, and that Plaintiff has produced almost no documents from the time of last year's event to the time of his permit application, and limited documents regarding UTR2 from the period February through July 2018, at which time he knew his posts were likely subject to disclosure. Given Plaintiff's failure to preserve prior communications, it is reasonable to infer that more recent posts have mostly taken on a decidedly

3

self-serving character.[2]  Moreover, while Plaintiff's counsel agreed to the imaging of his phone and computer media in recognition of these gross discovery failures, delays in that process caused in part by counsel's decisions meant that Defendants have not been able to review a single document from that process.[3]  Even as late as the July 20 re-opened deposition of Plaintiff there were additional unproduced documents identified.   Kessler Depo., Ex. A at 185-87 (ECF No. 68-1 at 25-27 (PAGE ID# 1098-1100)).   Defendants have thus been unable to review a significant number of responsive documents, which has prejudiced their ability to provide additional information in their opposition to Plaintiff's motion for preliminary injunction.

Despite Plaintiff's failure to comply with his discovery obligations, Defendants have been able to present substantial evidentiary information for the Court's consideration, and believe it is more than sufficient to support the decision to deny the permit.  Plaintiff's motion

---

[2]      Plaintiff testified at his first deposition that the communications application "Signal" "wipes itself," meaning it deletes users' messages.  Kessler Depo., Ex. A at 28 (ECF No. 31-4 at. 58 (PAGE ID# 654)).  Later, however, Plaintiff produced screenshots of some of his Signal messages with individuals about UTR2 planning, one of which showed that the other individual had applied an optional "disappearing" function (a.k.a. the deletion function) to the messages. Kessler Depo., Ex. A at 200-01, 235-36 (ECF No. 68-1 at 36, 37, 67, 68 (PAGE ID#s 1109-10, 1140-41)).  At his re-opened deposition, Plaintiff confirmed that he had actually applied the disappearing function to some of his own messages on Signal, though he implausibly claimed that he only applied the function to messages unrelated to this litigation. Kessler Depo., Ex. A at 199 (ECF No. 68-1 at 35 (PAGE ID #s 1108)). Despite knowingly using Signal to communicate with others about his proposed event, Plaintiff did not advise anyone to save messages about his proposed event until after his deposition on June 27 (Kessler Depo., Ex. A at 202-05 (ECF No. 68-1 at 38, 39 (PAGE ID # 1111-12)). As a result, the earliest Signal messages Defendants have received about planning the proposed event are from June 13, a week before his first discovery responses were produced. Kessler Depo., Ex. A at 235-36(ECF No. 68-1 at 67-68 (PAGE ID# 1140-41)). The conclusion that Plaintiff's use of the disappearing function led to the deletion of relevant messages is inescapable.

[3]      The parties  received "hit reports" on July 18 that identified the number of documents that contain each search term in two of the devices (laptop and desktop), but Plaintiff's counsel would not authorize the material to be uploaded for his review until July 20, and, to Defendants' knowledge, has not completed that review.  On July 23, the parties received hit reports for Plaintiff's cell phone.  None of these documents have been produced to Defendants.

can be denied on many independent grounds as well. Plaintiff's discovery failures thus do not preclude the Court from making a timely ruling. And if the Court believes it necessary, it can also infer based on his conduct that information the Plaintiff has not made available–including the planning information he posted to sites knowing it would be deleted–would be unfavorable to the Plaintiff's assertions that there are no legitimate safety concerns supporting denial of his permit and that he is a responsible event organizer.

### A.    Plaintiff's Permit Application and Its Denial

PFF 1.  Plaintiff filed his application for the 2018 event on November 27, 2017.  ECF No.1-3 (PAGE ID# 15-17); Kessler Depo., Ex. A at 100 (ECF No. 31-4 at 129 (PAGE ID# 725-27)).

PFF 2.  In his application, Plaintiff estimated that 400 people would attend, a number he admitted he pulled "out of a hat," just as he had no basis for his estimate of 400 people for the 2017 Unite the Right event ("UTR1").  Kessler Depo., Ex. A at 42-43 (ECF No. 31-4 at 71-72 (PAGE ID# 667-68)).  Plaintiff promoted last year's UTR1 via the internet, dark web, and social media platforms, extending invitations to thousands of potential attendees ("invitees") within seconds of each push of a button on a computer or smart phone.

PFF 3.  The City, on the other hand, had a credible estimate that 1,000 to 1,500 people would attend his event last year.  Lewis Decl., Ex. D at 3 (ECF No. 31-2 at 2 (PAGE ID # 586)); Jones Depo., Ex. C at 8-9.

PFF 4.  Faced with Mr. Jones' testimony that 1000 persons had attended on Plaintiff's side last year, 2 1/2 times more than the baseless number in Plaintiff's application, Plaintiff sought to undermine Mr. Jones' testimony by planning to present information to the Court that he knew was misleading.  He contacted a co-planner of UTR1, Al Stankard, who estimated that

650 to 1,000 people attended (not including counter-demonstrators). Kessler Depo., Ex. A at 204-08, 237-39 (ECF No. 68-1 at 40-44, 69-71 (PAGE ID#s 1113-17, 1142-44)). Plaintiff stated that Mr. Stankard was probably correct but that "some news reports" had put the number of his attendees at 400-500. Plaintiff stated that these figures were "lowballed," but "[t]hat doesn't mean I can't use them as evidence in court." *Id.* He then he asked Mr. Stankard to provide newspaper articles that reported these lower totals, even though he believed them to be wrong. *Id.*

PFF 5. In September 2017, Plaintiff stated in a private chat on Discord that "1,000-1,200 people most likely" attended his Unite the Right 1 event on his side. Kessler Depo., Ex. A at 191, 228, 232 (ECF No. 68-1 at 31, 60, 64 (PAGE ID #s 1104, 1133, 1137)).[4]

PFF 6. In addition to providing the same baseless estimate of a 400-person attendance he has used the year before, Plaintiff's application for the August 2018 Unite the Right 2 ("UTR2") event sought a 32 hour permit, but did not provide a list of specified activities or even an agenda. ECF No. 1-3 (PAGE ID#15-17); Kessler Depo., Ex. A at 46-47 (ECF No. 31-4 at 75-76 (PAGE ID#s 671-72)).

PFF 7. The City reviewed Plaintiff's application for the proposed August 2018 event, consulted with public safety officials, and rejected it in writing, in a letter dated December 11, 2017, citing three categories of reasons. ECF No. 1-4 (PAGE ID#s 18-19).

PFF 8. First, the City denied Plaintiff's application based on public safety concerns, including that the event presents a "danger to public safety" which cannot be accommodated during the time frame and within the area of the City Plaintiff sought utilizing a reasonable amount of City funds and/or police resources, and it "likely underestimates the number of

---

[4]     Plaintiff confirmed at his re-opened deposition that he uses the name "Zebo" on Discord chat. Kessler Depo., Ex. A at 191 (ECF No. 68-1 at 31 (PAGE ID# 1104)).

6

participants." *Id.*; Jones Depo., Ex. C at 8 (ECF No. 31-4 at 9 (PAGE ID# 605)). The City's conclusion was consistent with the much higher number of participants that attended UTR1. Plaintiffs' now-disclosed plans to misrepresent the actual number of attendees at that event demonstrate his awareness that this fact is damaging to his case for a permit for UTR2.

PFF 9. Second, the City noted that Plaintiff's application proposed activities beyond those permitted by City regulations—specifically the use of Emancipation Park during hours it is closed for activities. ECF No. 1-3 (PAGE ID #15-17); Jones Depo., Ex. C at 11, 12 (ECF No. 34-1 at 11, 12 (PAGE ID#s 607-08)). Although Plaintiff has erroneously stated that he amended his application to match Emancipation Park's operating hours, (ECF No. 1-5 at 2 (PAGE ID#21)), Plaintiff did not in fact do so. Kessler Depo., Ex. A at 57-58 (ECF No. 31-4 at 86-87 (PAGE ID #s 682-83)); Plaintiff's Memorandum, ECF No. 22 at 4 (PAGE ID# 87) ("it is technically true that Mr. Kessler did not file an amended application").

PFF 10. Third, Plaintiff's application failed to document how he would exercise responsibility for the event and the behavior of the participants. ECF No. 1-3 (PAGE ID #15-17); Jones Depo., Ex. C at 13 (ECF No. 31-4 at 13 (PAGE ID# 609)).

PFF 11. Content or viewpoint discrimination played no part in the decision to deny Plaintiff's permit for the UTR 2 event. Jones Depo., Ex. C at 18, 22-23 (ECF No. 31-4 at 18, 22-23 (PAGE ID#s 614, 618-19)).

PFF 12. Plaintiff has produced no evidence of content or viewpoint discrimination related to UTR2.

PFF 13. Mr. Jones testified without contradiction that as to groups that might be planning to come to Plaintiff's proposed event this year, "their message wasn't what concerned me, it was the violence that concerned me, and the public safety issues associated with that

7

violence." Jones Depo., Ex. C at 17 (ECF No. 31-4 at 17 (PAGE ID# 613); *see also id*. at 6 (PAGE ID# 603)).

PFF 14. The City granted the Ku Klux Klan a permit for an event in July 2017, even though their message is repugnant to many in the community, because the City respects First Amendment rights and did not expect the event to cause a public safety problem. Jones Depo., Ex. C at 14 (ECF No. 31-4 at 14 (PAGE ID# 610)).

PFF 15. Plaintiff himself received a permit for his August 12, 2017 event (later modified as to location), even though he had just participated in a well-publicized torchlit rally with Richard Spencer, another figure whose political views are anathema to many Charlottesville citizens. Defendants' Opposition, ECF No. 31-1 at 1-2 (PAGE ID # 580-81). On August 7, 2017, the City sought to move Plaintiff's event to a safer location, only after receiving information the City regarded as credible, that a significant public safety threat was imminent. Jones Depo., Ex. C at 5-6 (ECF No. 31-4 at 6-7 (PAGE ID#s 602-03)). That information proved correct. Jones Decl., Ex. B at 5 (ECF No. 31-1 at 2 (PAGE ID# 581)).

PFF 16. Rather than address the City's concerns as stated in the permit, Plaintiff had his attorney write Chief Deputy City Attorney Lisa Robertson to demand a permit for the 2018 event on unspecified terms and conditions. The letter made no effort to address the City's stated concerns about public safety or the absence of a responsible party. ECF No. 1-5 at 2 (PAGE ID# 21); Jones Decl., Ex. B at 5 (ECF No. 31-1 at 4 (PAGE ID# 583)). Since Plaintiff's letter provided no new information and did not address the City's concerns about the public safety risks the event posed, or the absence of a party responsible for the behavior of the event's attendees, Ms. Robertson referred Plaintiff's counsel to the City's denial letter and its event permitting regulations. ECF No. 1-5 at 3 (PAGE ID# 22).

8

PFF 17.  Plaintiff filed this action against the City and City Manager Jones on March 6, 2018, nearly three months after the denial.  Plaintiff then delayed serving the City and Mr. Jones for an additional six weeks for reasons he was unable to explain.  Kessler Depo., Ex. A at 21, 22. Notwithstanding Defendants' good faith efforts to expedite the suit, the short time remaining would significantly impair the City's efforts to prepare for Plaintiff's even were relief to be granted.  Jones Decl., Ex. B at 5 (ECF No. 31-1 at 4 (PAGE ID# 583)).

### B.     Plaintiff's Current Description of the Event He is Planning Bears No Resemblance to His Application

PFF 18.   Both preceding and throughout the course of this litigation, Plaintiff has attempted to fundamentally change the nature of his Proposed Event, so that the current event will seemingly bear no relationship to the event for which he sought a permit in November 2017. The last change Plaintiff announced, in a July 12, 2018, YouTube video, and confirmed in his July 20 deposition, would consist of 24 persons and not require a permit under city regulations, which require a permit only for events at which more than 50 persons are expected, or for which street closures or park reservations are sought.  Kessler Depo., Ex. A at 180-82 (ECF No. 68-1 at 21-23 (PAGE ID#s 1094-96)).

PFF 19.  Plaintiff's original permit application sought to reserve Emancipation Park for 32 hours over the course of August 11 and 12 to hold an event for 400 attendees. Since he submitted his application, Plaintiff has variously described the event he now wishes to stage as consisting of different times, dates, and estimated attendance, without ever formally modifying his application or submitting a new one.  ECF No. 1-3 (PAGE ID#s 15-17).

PFF 20.   On December 16, 2017 Plaintiff, without amending or resubmitting his application, purported to change the time for which he sought to reserve the Park to conform

with the Park's hours of operation. Ex. O (Dec. 16, 2017 e-mail from J. Kessler to City employees) (ECF No. 23-5 (PAGE ID#s 140-41)).

PFF 21. On June 20, 2018, Plaintiff stated in his response to Defendants' Interrogatories that he and his potential attendees would gather at 11 a.m. on August 12 to march to the Park, begin speeches in the Park at 1 p.m., and leave by 2:30 or 3:00 p.m., using the Park for only 1.5 to 2 hours total on only one day. Ex. H (Plaintiff's Responses to Discovery Requests) (ECF No. 25-9 at 2 (PAGE ID# 468); ECF No. 25-9 at 3 (PAGE ID # 469)).

PFF 22. On July 7, 2018, Plaintiff informed members of the National Park Service that he no longer plans to hold his event in Charlottesville on the same day as his D.C. event, which is August 12. Ex. M (July 10, 2018 e-mail chain from J. Kessler) (ECF No. 68-1 at 11-13 (PAGE ID#s 1084-86)). Plaintiff did not disclose this to the City until four days later, on July 11, when his counsel informed Defendants' counsel, via e-mail that Plaintiff now desires to hold his event on August 11. Kessler Depo., Ex. A at 180-81 (ECF No. 68-1 at 21-22 (PAGE ID#s 1094-95)); Ex. I at 2 (ECF No. 53-1, at 4 (PAGE ID# 1004)).

PFF 23. Plaintiff thus no longer plans to hold his event on the day he claimed was "critical" to his message. ECF No. 1 at 3 (PAGE ID# 3).

PFF 24. At no point has Plaintiff filed an amended permit application with the City. Plaintiff's Memorandum, ECF No. 22 at 4 (PAGE ID# 87).

PFF 25. In addition to changing the time and date of his Proposed Event, Plaintiff's estimates of the number of people he believes will attend has changed from the 400 stated in his application, a number he admitted had no basis, *see* PFF 2, *supra*, to 300 in June, 2018, Ex. H at 5 (Plaintiff's Responses to Discovery Requests) (ECF No. 25-9 at 4 (PAGE ID # 470)), to the "two dozen people" that he announced publically on June 12, would attend the event.

10

Defendants' Sur-Reply Regarding Militia Case, ECF No. 53, July 12, 2018 Interview of J. Kessler ("July 12 Interview") *available at* https://www.youtube.com/watch?v=kYQ8Of6L_aE at 14:15-14:30 (*last accessed* July 17, 2018) at 2, n.1 (PAGE ID# 991). Plaintiff confirmed in his re-opened deposition on July 20 that two dozen is his current estimate. Kesslder Depo., Ex. A at 180-82 (ECF No. 68-1 at 21-23 (PAGE ID# 1094-1096)). *See also* PFF 1-6, *supra*.

PFF 26. Plaintiff is not sure who will speak at the event, other than himself and another individual, if he is granted a permit. Kessler Depo., Ex. A at 182-83 (ECF No. 68-1 at 23-24 (PAGE ID#s 1096-97)). In June, 2018 Plaintiff stated he would have six speakers, including David Duke. Ex. H at 4 (Plaintiff's Responses to Discovery Requests) (ECF No. 25-9 at 3 (PAGE ID# 469).

PFF 27. Plaintiff's significant and unilateral alterations to his plans further underscore his unreliability and the difficulties the City faces in preparing for the various iterations of Plaintiff's proposed event. Plaintiff continues to utilize social media, the internet and the dark web to promote his "modified" event, *see* PFF 2, *supra*—which supports Defendants' concern that Plaintiff does not and will not know who or how many people will plan to attend his proposed event.

### C.    Plaintiff's Background, Lack of Capabilities, and Past Lack of Candor

PFF 28. Plaintiff's political activities in Charlottesville began in December 2016 when he stole a Florida businesswoman's identity and likeness to start a recall campaign. Kessler Depo., Ex. A at 81-83 (ECF No. 31-4 at 110-112, 195-202 (PAGE ID#s 706-08, 791-98)). At his deposition Plaintiff claimed to be unable to recall if the reports of his deception were true. Kessler Depo., Ex. A at 81-82 (ECF No. 31-4 at 110-11 (PAGE ID#s 706-07)).

11

PFF 29.  During this recall effort Plaintiff was arrested and convicted for assault and battery of a citizen with whom he got into a disagreement.  Kessler Depo., Ex. A at 30-31 (ECF No. 31-4 at 60-61 (PAGE ID#s 656-57)).  Once charged, Plaintiff had an arrest warrant issued based on his sworn testimony that the victim had attacked him, but on review of the evidence the Commonwealth's Attorney declined to prosecute and instead referred Plaintiff for a perjury prosecution.  Kessler Depo., Ex. A at 31-32 (ECF No. 31-4 at 61-62 (PAGE ID#s 657-58)). Plaintiff acknowledged at his deposition that his perjury charge was dismissed because the prosecutor failed to establish venue, not because there was insufficient evidence Plaintiff had lied under oath.  Kessler Depo., Ex. A at 32-33 (ECF No. 31-4 at 62-63 (PAGE ID#s 658-59)).

PFF 30.  Plaintiff's deceptive conduct played a key role in the violence that occurred at his August 2017 event in Charlottesville.  First, while professing peaceful intentions in public, among like-minded individuals, Plaintiff was instead secretly encouraging and welcoming violence.  *See* PFF 54-58, *infra*. Second, while purporting to cooperate with the police to secure the safety of his event, including the inspection of the police department's security plan by Plaintiff, and discussions by his security team with the Charlottesville Police Department.  Lewis Decl., Ex. D at 2 (ECF No. 31-2 at 1 (PAGE ID # 585)), Plaintiff and his private security team created security plans that were not shared with the police.  Those private security teams agreed to plans with the police for security for the event speakers, but then reneged on those plans at the last minute in a way that convinced their police contacts that they never intended to keep their commitments. *See* PFF 37-48, *infra*.

PFF 31.  Prior to Plaintiff's recall effort, he had been employed for two five-month stints over a seven year period, and had done some freelance writing.  Kessler Depo., Ex. A at 7-11,

12

13, 85-88 (ECF No. 31-4 at 42-47, 114-17 (PAGE ID#s 638-43, 710-13)). Plaintiff had no experience planning or supervising events or people. *Id.*

PFF 32.   When Charlottesville became a focus of white supremacist activity in 2017, Plaintiff reinvented himself as a provocateur.  An acquaintance who had been involved in some of his activities testified that he believes Plaintiff manufactured "spectacles" around town by, for example, utilizing social media to make inflammatory comments and then announcing his location as a means to provoke others to confront him.  Lambert Depo., Ex. F at 5-6, 10-12 (ECF No. 31-4 at. 28-29, 33-35 (PAGE ID#s 624-25, 629-31)).  Plaintiff provoked one such encounter after being initiated into the Proud Boys, a group recently involved in a riot in Portland, Oregon along with some of the same groups that were in Charlottesville last year.  Lambert Depo., Ex. F at 10-12 (ECF No. 31-4 at 33-35 (PAGE ID#s 624-25, 629-31)); Lewis Decl., Ex. D at 7 (ECF No. 31-2 at 6 (PAGE ID# 590)).

PFF 33.  Plaintiff's lack of candor has also been shown in this litigation.

a.       In addition to planning to mislead the Court about the number of his attendees at UTR1, as set out in PFF 4, *supra*, Plaintiff was not forthright at his deposition about his longstanding communications with an individual known as "Ludovici Alibi," who posted a poll on Facebook on June 13, 2018, asking whether a violent extremist group known as the Atomwaffen Division should serve as security for Plaintiff's proposed event.  Kessler Depo., Ex. A at 131-32 (ECF No. 31-4, at 161 (PAGE ID# 757)).  Recognizing that this post was very damaging to his effort to portray his proposed UTR2 event as nonviolent, Plaintiff immediately sought to distance himself from Mr. Alibi.  Asked about him at his deposition, Plaintiff suggested that he had no prior dealings with Mr. Alibi and that he had merely come into the group unknown and unbidden. *See* Defendants' Sur-Reply Regarding Militia Case, ECF No. 53

13

at 4, n. 2 (PAGE ID# 993) ("[s]ince [Ludovici Alibi] made this post, I have become concerned and have looked into him."). *See also* Kessler Deposition, Ex. A at 71-72 (ECF No. 31-4 at 100-101 (PAGE ID# 696-97)) (acknowledging the impression he was trying to leave). The truth, however, is that Plaintiff had corresponded with "Ludovici Alibi" long before he made that post. In fact, the two had been communicating for at least a five month period between August 3, 2017, and January 25, 2018. Ex. J (Facebook messages between J. Kessler and "Ludovici Alibi") (ECF No. 53-1, at 10-23 (PAGE ID #s 1010-1023)); Kessler Depo., Ex. A at 210-12 (ECF No. 68-1 at 46-48 (PAGE ID #s 1119-1121)). Faced with this record, which became available to Defendants only after the initial deposition, Plaintiff stated that he was under the impression up until June 2018 that Ludovici Alibi was actually Andrew Anglin, who himself has a violent past and is currently a fugitive from justice. Kessler Depo., Ex. A. at 210-212 (ECF No. 68-1 at 46-48 (PAGE ID#s 1119-1121)); Ex. J (Facebook messages between J. Kessler and "Ludovici Alibi") (ECF No. 53-1, at 10-23 (PAGE ID # 1010-1023)). *See also* PFF 67, *infra*.

b.    Plaintiff also falsely claimed that he did not invite Richard Spencer to his proposed event in Charlottesville and his event in Washington, D.C. In February 2018, Plaintiff stated on Discord that Richard Spencer would not be invited to these events because he "called off the police escort" for the speakers at the Unite the Right rally, which "got people hurt." Kessler Depo., Ex. A at 191-93, 228-229 (ECF No. 68-1 at 31, 60-61 (PAGE ID#s 1104, 1133-34))). Notwithstanding this acknowledgement, Plaintiff, three months later, invited Spencer to both events. Kessler Depo., Ex. A at 196-97, 233-34 (ECF No. 68-1 at 33-34, 65- 66 (PAGE ID#s 1106-07, 1138-39)). When questioned about the invitation, Plaintiff stated that he does not intend for Spencer to come, does not want him to attend, and only texted him as a courtesy. *See* Kessler Depo., Ex. A at 195-97 (ECF No. 68-1 at 32-34 (PAGE ID#s 1105-07)). But the text

messages, in which Plaintiff advises Mr. Spencer of the events and Spencer responds that he will "seriously consider" it can only be read as an invitation.

        c.     Plaintiff falsely swore under oath in his Interrogatory answers that he did not recall communicating with Mr. Boechat about UTR2. *See* Kessler Depo., Ex. A at 158-60 (ECF No. 31-4 at 187-89 (PAGE ID#s 783-85)). Yet, Plaintiff communicated with Mr. Boechat on Gab, and later called Mr. Boechat in advance of his deposition. Ex. N at 2 (ECF No. 25-10 (PAGE ID # 475-76)); Ex G at 4 (ECF No. 37-1 at 4 (PAGE ID # 817)).

PFF 34. Plaintiff's inability to follow through in an organized way to meet commitments also has been shown by his continued discovery failures, outlined above.

### D.     Plaintiff's 2017 UTR1 Event

PFF 35. In April 2017 Plaintiff met Richard Spencer, who is credited with coining the tern "alt right." Kessler Depo., Ex. A at 36 (ECF No. 31-4 at 66 (PAGE ID#s 662)). The following month, May 2017, Plaintiff participated in a prominent alt-right event in Charlottesville, (Kessler Depo., Ex. A at 12 and soon after the May event Plaintiff filed his permit application for the August 12, 2017 event.

PFF 36. Following the City's procedures, Plaintiff's application for the 2017 event was sent to various City offices responsible for police protection, fire, emergency medical services, street closings, and other related issues, and in late May 2017 the City granted Plaintiff a permit for a five hour event with a two hour staging period beginning at 10 AM. Jones Decl., Ex. B at 2 (ECF No. 31-1 at 1 (PAGE ID# 580)). The City relies on event organizers to provide it with accurate information on the nature of the event, the planned activities, any special security concerns, and any special equipment or other resources needed. *Id.* at 2-3 (PAGE ID # 580-81).

15

PFF 37. The City followed the same procedure when it granted the Ku Klux Klan a permit for an event in a local park on July 8, 2017. Jones Decl., Ex. B at 3 (ECF No. 31-1 at 2 (PAGE ID# 581)).

PFF 38. The Klan organizer cooperated with the Charlottesville Police Department's plan for ensuring the security of the Klan demonstrators at the event. *Id.* There was an agreed upon "staging area" where the police would meet the Klan members and escort them into Justice Park and an agreed upon plan for escorting the Klan out of the park and back to their vehicles. Although the exit plan changed due to counter-protestor conduct, the Klan cooperated and no violence occurred between the Klan and counter-protestors. *Id.* Plaintiff's complaint states that the Klan event is a model for protection of speakers such as him. ECF No. 1 at 4 (PAGE ID # 4).

PFF 39. On August 8, Plaintiff met with the police department, including Capt. Wendy Lewis, to discuss his security needs for the 2017 event. Lewis Decl., Ex. D at 4 (ECF No. 31-2 at 3 (PAGE ID # 587)). Plaintiff had also communicated with Capt. Lewis via text message about the security plan in the days leading up to the 2017 event. Lewis Decl., Ex. D at 2 (ECF No. 31-2 at 1 (PAGE ID # 585)).

PFF 40. Although it was his event, Plaintiff failed to devote sufficient attention to security for it, ultimately failing to comply with a security plan to which his designated cohorts had agreed. Jones Depo., Ex. C at 4-5 (ECF No. 31-4 at 5-6 (PAGE ID# 601-02)); Newberry Decl., Ex. E at 3-4 (ECF No. 31-3 at 2-3 (PAGE ID#s 595-96)); Lewis Decl., Ex. D at 4-6 (ECF No. 31-2 at 3-5 (PAGE ID#s 587-89)). Plaintiff delegated security responsibilities to Elliot Kline and Jack Pierce because he was too "busy on other things and couldn't focus on" it. Kessler Depo., Ex. A at 52-53 (ECF No. 31-4 at 81-82 (PAGE ID # 677-78)); Newberry Decl., Ex. E at 3-4 (ECF No. 31-3 at 2-3 (PAGE ID#s 595-96)); Lewis Decl., Ex. D at 4-6 (ECF No.

31-2 at 3-5 (PAGE ID#s 587-89)).   Plaintiff advised Capt. Lewis that Elliot Kline (who sometimes went by Eli Mosely in homage to British Fascist Oswald Mosley), *see* Kessler Depo., Ex. A at 37-38, and Jack Pierce (whose full name is believed to be Allison R. Pierce, III) were in charge of security for his event.  Lewis Decl., Ex. D at 4, 8 (ECF No. 31-2 at 3, 7 (PAGE ID#s 487, 591)).

PFF 41.  Plaintiff and his representatives had several discussions with law enforcement about the details of the security plan for the event.  Jones Depo., Ex. C at 4 (ECF No. 31-4 at 5 (PAGE ID# 601)).  The agreed upon plan for speaker security was for police personnel to escort the speakers into the back of Emancipation Park.  Newberry Depo., Ex. E at 3 (ECF No. 31-3 at 2 (PAGE ID# 595)).

 PFF 42.  The agreed upon plan for the security of attendees was that they would stay together and enter the park from the West.  Lewis Decl., Ex. D at 5 (ECF No. 31-2 at 4 (PAGE ID # 588)).

PFF 43.  On August 11, 2017, Captain Lewis texted Plaintiff that the plan to escort speakers for the 12th was in place, and that law enforcement was preparing for the event.  Lewis Decl., Ex. D at 4, 8 (ECF No. 31-2 at 3, 7 (PAGE ID#s 587, 591)).  Plaintiff replied that Elliot Kline was in charge of security, including Mr. Kline's mobile number in the text.  *Id.*

PFF 44.  Although Plaintiff purported to be cooperating with law enforcement, he was in fact making his own secret security plans that he did not share with law enforcement.  His designated security personnel reneged on a clear security agreement as to the speakers, and his attendees also failed to follow the security plans and came into the Park from all sides, rather than in an orderly fashion from the West as agreed.  PFF 46-48 *infra*.

PFF 45. Mr. Kline developed a security plan that he circulated to leaders of the 2017 event, including Plaintiff, on August 1. Kessler Depo., Ex. A at 79, 147-57 (ECF No. 31-4 at 108, 176-186 (PAGE ID#s 704, 772-82)). Plaintiff did not share this document with law enforcement, however, and does not know if it was ever shared with law enforcement. *Id*.

PFF 46. Plaintiff now blames Mr. Kline and Mr. Pierce for the security failures at the 2017 event, claiming that Mr. Kline was in charge of and responsible for what was happening on the ground during the rally, and that Mr. Pierce reneged on a security agreement for rally speakers with Sgt. Newberry of the Charlottesville Police Department. Kessler Depo., Ex. A at 38, 40-41 (ECF No. 31-4 at 67, 69-70 (PAGE ID#s 663, 665-66)). But Plaintiff himself was the "principal organizer" of the 2017 event (Plaintiff's Memorandum, ECF No. 22 at 1 (PAGE ID# 84)), and had himself delegated the key security responsibilities to Kline and Pierce. PFF 40, 43 *supra*.

PFF 47. On the morning of the 2017 event, Plaintiff and his speakers reneged on the security plans they had agreed upon with law enforcement. Plaintiff and the other speakers gathered with some of their attendees in McIntire Park. Newberry Decl., Ex. E at 3-4 (ECF No. 31-3 at 2-3 (PAGE ID#s 595-96)). After 9:30 a.m., Sgt. Newberry called Mr. Pierce, pursuant to their arrangement, to inform him that law enforcement was available to escort the speakers into Emancipation Park pursuant to the agreed upon plan. *Id*. Mr. Pierce told Sgt. Newberry that the speakers would likely forego the escort and would instead come with the attendees without an escort. Newberry Decl., Ex. E at 4 (ECF No. 31-3 at 3 (PAGE ID# 596)). Sgt. Newberry attempted to talk Pierce into staying with the original plan, stating that it was "still" workable to escort the speakers into the back of the Park as planned. Ex. Q (Audio file to be played at Hearing). Pierce responded that he thought the speakers would go in with the attendees and

would let Sgt. Newberry know if and when that changed. Newberry Decl., Ex. E at 4 (ECF No. 31-3 at 3 (PAGE ID# 596)); Lewis Decl., Ex. D at 6 (ECF No. 31-2 at 5 (PAGE ID# 589)); Ex. Q (audio recording).

PFF 48. Within minutes of Mr. Pierce telling Sgt. Newberry the he would let him know if the speakers wanted the escort as the original plan had provided, Sgt. Newberry saw a "bunch of" vans, ultimately 8-10, approaching the back of the Park. Newberry Decl., Ex. E at 6 (ECF No. 31-3 at 3 (PAGE ID # 596)). Pierce, must have known the vans were on the way, even though he was at the very same time suggesting to Sgt. Newberry that he would let him know ahead of time what the demonstrators decided, and acknowledged that that was the "first wave." Ex. Q. Sgt. Newberry saw 8-10 large vans, which each dropped off twenty or so demonstrators, many of whom were armed, near the area designated for the speaker drop-offs. Newberry Decl. Ex. E at 4 (ECF No. 31-3 at 3 (PAGE ID# 596)). Sgt. Newberry immediately believed he had been duped by Plaintiff's security personnel, who never had any intention of cooperating with the security plan to which they had agreed. *Id.* Sgt. Newberry turned to Det. Braden Kirby at the time and stated, "[t]hey have no intention of this going well." *Id.*

PFF 49. Plaintiff continues to misrepresent these facts. At his re-opened deposition, Plaintiff falsely stated that it was the Charlottesville Police Department that had called off the escort, not his own security personnel refusing to comply with the security plan and making the escort impossible. Kessler Depo., Ex. A at 193-94. Indeed, Plaintiff used this false narrative to try to explain away his May 2018 invitation to Richard Spencer to his UTR2 event (or events), even though in February 2018 Plaintiff had stated in a group chat that Spencer had failed to comply with a security plan and "got[ten] people hurt." PFF 33.b, *supra*. Plaintiff suggested at the July 20 deposition that he had changed his views by May as to whether Spencer was really at

19

fault (Kessler Depo., Ex. A at 193-95 and ECF No. 68-1 at 32-34 (PAGE ID #s 1105-07)), but as set out above, Plaintiff had been clear in his June 27 deposition, before being confronted with the May invitation to Spencer, that Spencer's security man Mr. Pierce had reneged on a security agreement for rally speakers with Sgt. Newberry of the Charlottesville Police Department. Kessler Depo., Ex. A at 40 (ECF No. 31-4 at 69 (PAGE ID #s 665)); PFF 46-48, *supra*.

PFF 50. Plaintiff's dissembling on the issue of his side's noncompliance with the security plans for UTR1 is further evidence of his unreliability and unfitness to receive a permit for UTR2.

PFF 51. Plaintiff's UTR1 event quickly spiraled out of control as violence erupted in the streets and in the Park itself. Plaintiff testified that he was not even aware of what was happening on the ground, and that Mr. Kline somehow took the event over from him. Kessler Depo., Ex. A at 38-41 (ECF No. 31-4 at 67, 68-70 (PAGE ID #s 663, 664-66)).

PFF 52. Plaintiff acknowledged to Capt. Lewis after the event that she had been "trying to do the right thing and ab[i]de by our original security plan." Lewis Decl., Ex. D at 6-7, 9-10 (ECF No. 31-2 at 5-6, 8-9 (PAGE ID #s 589-90, 592-93)).

PFF 53. Plaintiff's failure, and that of his designated security personnel, to comply with the security plan contributed to the violence and made it harder for law enforcement to keep the sides separate. Lewis Decl., Ex. D at 6 (ECF No. 31-2 at 5 (PAGE ID# 589)).

**D.**   **While Plaintiff Was Stating Publicly That He Wanted UTR1 To Be A Peaceful Event, In Private, He Was Encouraging And Enticing Attendees To Engage In Violence**.

PFF 54. On June 7, 2017, Plaintiff posted on the "Charlottesville 2.0" Discord server for attendees of the 2017 event: "I recommend you bring picket sign posts, shields and other self-defense implements which can be turned from a free speech tool to a self-defense weapon…"

20

(Kessler Depo., Ex. A at 68, 125-26 (ECF No. 31-4 at 97, 154-55 (PAGE ID#s 693, 750-51)) and "[w]e should bring picket signs that can be used as sticks to bludgeon our enemies if they get violent." Kessler Depo., Ex. A at 75, 143-44 (ECF No. 31-4 at 104, 172-73 (PAGE ID#s 700, 768-69)).

PFF 55. On June 9, 2017, Plaintiff also posted on the same Discord server that "[i]f you want a chance to crack some Antifa skulls in self-defense don't open carry. You will scare the shit out of them and they'll just stand off to the side." Kessler Depo., Ex. A at 75-76, 145-46 (ECF No. 31-4 at 104-05, 174-75 (PAGE ID#s 700-01, 770-71)).

PFF 56. Plaintiff also affirmed and ratified messages of violence. For instance, he "liked" a message written on Facebook by CJ Ross of the "Virginia Three Percenters"[5] which stated that the "3% groups," will "walk in there [Unite the Right 1] with a thousand men and crush these little c[**]t rags for good." Kessler Depo., Ex. A at 67, 68, 122-24 (ECF No. 31-4 at 96-97, 151-53 (PAGE ID#s 692-93, 747-49)).

PFF 57. More than just promoting and welcoming violence, Plaintiff recruited people for the purpose of serving as "enforcers against Antifa." Kessler Depo., Ex. A at 65-66, 118-119 (ECF No. 31-4 at 94-95, 147-48 (PAGE ID #s 690-91. 743-44)). He called for attendees to become a "highly organized defense against…Antifa" by joining a "shield wall" to be deployed

---

[5]    The "three percenters" describe themselves as advocating armed resistance to purported restriction of their liberties. *See* https://web.archive.org/web/20171013113529/http://sipseystreetirregulars.blogspot.com/2009/02/what-is-three-percenter.html (*last accessed* July 4, 2018). The Fourth Circuit held in *G.G. ex rel. Grimm v. Gloucester City. Schlep. Bd.*, 822 F.3d 709, 725-26 (4th Cir. 2016), *vacated on other ground*s, 137 S. Ct.1239 (2017) that at the preliminary injunction phase of a case, proffered evidence should not be "summarily reject[ed]" simply "because it may have been inadmissible at trial," though it also noted that "admissible evidence may be more persuasive than inadmissible evidence in the preliminary injunction context." The City on occasion cites hearsay evidence, but, unlike the Plaintiff, relies here almost entirely on the kind of admissible evidence that the Fourth Circuit has stated may be "more persuasive."

on the day of the Unite the Right 1 Rally. Kessler Depo., Ex. A at 62-63 (ECF No. 31-4 at 91-92, 133-35 (PAGE ID #s 687-88, 729-31)).

PFF 58. Plaintiff also saw violence as a means to "drum up interest" in his event. For example, he encouraged individuals to participate in an event with the "Proud Boys" in order to "bait Antifa into attacking the Proud Boys" to "drum up interest in Alt-light circles" for the 2017 event. Kessler Depo., Ex. A at 64, 112-17 (ECF No. 31-4 at 93, 141-46 (PAGE ID#s 689, 737-42)).

PFF 59. One of the attendees at Plaintiff's 2017 event, James Fields, is currently being prosecuted for the vehicular homicide of Heather Heyer on the day of Plaintiff's event, and for federal hate crimes. *U.S. v Fields*, 3:18-cr-00011 (W.D. Va.). Fields was allegedly a member of an organization known as "Vanguard America," and he was dressed in the Vanguard America "uniform" (i.e., white shirts, khakis, and carrying large defensive shields with insignia). Plaintiff ratified Mr. Fields' deadly violence against Ms. Heyer, stating after her death that "Heather Heyer was a fat, disgusting Communist. Communists have killed 94 million. Looks like it was payback time." Kessler Depo., Ex. A at 15-16, 89-90 (ECF No. 31-4 at 49-50, 118-19 (PAGE ID#s 645-46, 714-15)).

PFF 60. In the aftermath of Plaintiff's 2017 event, he admits that even his own associates no longer have confidence in him as a leader of a major event. Kessler Depo., Ex. A at 14-15, 55-56,89-98 (ECF No. 31-4 at 48-49, 84-85, 118-27 (PAGE ID#s 644-45, 680-81, 714-23)); *see* Lambert Depo., Ex. F at 7 (ECF No. 31-4 at 30 (PAGE ID# 626)).

PFF 61. Despite encouraging and preparing for violence, and actively undermining and allowing others to actively undermine the City's ability to protect the public, Plaintiff has not accepted any responsibility or blame for the massive disorder arising from his 2017 event.

Kessler Depo., Ex. A at 34-35 (ECF No. 31-4 at 64-65 (PAGE ID# 660-61)). Plaintiff chooses instead to blame, among others, the City, the police, the judiciary, Elliot Kline, Jack Pierce, and counter-protestors. Kessler Depo., Ex A at 40, 41, 44, 48-50 (ECF No. 31-4 at 69-70, 73, 77-79 (PAGE ID#s 665-66, 669, 673-75)).

PFF 62. Plaintiff was described by a former associate as "callous" to the harm caused by the 2017 event and as having "no regard" for the people who were hurt and no regrets. Lambert Depo., Ex. F at 7 (ECF No. 31-4 at 30 (PAGE ID# 626)).

### E. Plaintiff's 2018 Event

PFF 63. As the date of Plaintiff's desired UTR2 event approaches, Plaintiff's delays in serving this complaint, his failure to timely and fully respond to discovery, and his failure to identify the necessary details for the event he actually wants to stage assure that, just as in 2017, the City will not have the details essential to ensure that his event can be conducted safely, if the City were required to grant him a permit. For example, Plaintiff refuses to provide the City with concrete or comprehensive information about which individuals and organizations are speaking at and planning to attend the event, and information about who is actually funding the event. Ex. H (Plaintiff's Responses to Discovery Requests) (ECF No. 31-4 at 187, 189 (PAGE ID#s 783, 785)); Kessler Depo., Ex. A at 222-24. That information is relevant to whether any provisions for Plaintiff's own security and the security of attendees are likely to materialize and/or the likelihood of the plans coming to fruition.

PFF 64. Plaintiff has been planning the event with a group of individuals and is using social media and communication applications to do so, including applications that erase their messages. Kessler Depo., Ex. A at 28-29 (ECF No. 31-4 at 58-59 (PAGE ID#s 654-55)).

PFF 65.  Despite claiming to be interested in organizing a peaceful event, Plaintiff has continued to applaud violence, just as he has in the past.  Within the last month Plaintiff delighted in the violence at a rally in Portland.[6]  These continuing statements celebrating violence between groups that support and oppose him signal that similar violent clashes are expected and welcomed at UTR2.

PFF 66.  In addition to lauding violence, Plaintiff continues to attract attention from extreme figures with documented histories of violence.  Plaintiff is aware that hundreds of individuals on Facebook have stated that they want Atomwaffen Division ("AWD"), an extremist group whose members have been charged with murder and other violent crimes, to provide security for Plaintiff's proposed 2018 event.  Kessler Depo., Ex. A at 68-70, 72-73, 131-137 (ECF No. 31-4 at 97-99, 101-02, 160-66 (PAGE ID#s 693-95, 697-98, 756-62)).

PFF 67.  Plaintiff attempted to distance himself from Atomwaffen by asserting at deposition that the person who proposed their assistance at UTR2, who goes by the alias Ludovici Alibi, was not who he thought he was when he corresponded with him for five months.  *See* PFF 33.a, *supra*.  However, Plaintiff acknowledged that he thought this individual was Andrew Anglin.  Kessler Depo., Ex. A at 210-12 (ECF No. 68-1 at 46-48 (PAGE ID#s 1119-1121)).  Andrew Anglin is the publisher of *The Daily Stormer*, regularly identified as the largest neo-Nazi website in the world. As reported in an article on Anglin's activities, which Plaintiff acknowledges he has read, (Kessler Depo., Ex. A at 213) Anglin has described on his website his "longing for a race war" and rather than support liberal democracy, Anglin "want[s] to burn it to the ground."  *See,  The  Making  of  An  American  Nazi*,  at https://www.theatlantic.com/magazine/archive/2017/12/the-making-of-an-american-

---

[6]      *See* https://gab.ai/TheMadDimension/posts/28584386; Kessler Depo., Ex. A at 23 (ECF No. 31-4 at 56 (PAGE ID #s 652) (confirming he posts on gab.ai as "TheMadDimension").

nazi/544119/ (last accessed July 20, 2018). Anglin also has harassed citizens, and overseen campaigns of harassment, to the extent that the local police in the town of Whitefish, Montana likened Anglin's actions to "domestic terrorism." *Id.* Readers of Anglin's publication have perpetrated horrific acts of violence. In addition to Dylan Roof, who read The Daily Stormer, "Thomas Mair shot and stabbed a British member of Parliament [in 2016]. This year, James Harris Jackson was charged with killing a black man with a sword in New York City and cited The Daily Stormer as an ideological influence. Devon Arthurs, an 18-year-old former neo-Nazi who converted to Islam, shot and killed two of his three roommates in Tampa, who were still neo-Nazis. Police arrested the surviving roommate for hoarding explosive materials."

PFF 68. Mr. Anglin is currently a fugitive from justice. *See Sines, et al. v. Kessler, et al.*, Case No. 3:17-cv-00072 (Oct. 11, 2017 W.D. Va.) (entering default against him).

PFF 69. Plaintiff also knows that people interested in his proposed event are discussing inviting another violent group known as Rise Above Movement. Kessler Depo., Ex. A at 72-74, 133-42 (ECF No. 31-4 at 101-03, 162-71 (PAGE ID#s 697-99, 758-67)).

PFF 70. Plaintiff has also invited further (secret) communication with an individual who said he wanted to join him to recruit 198 men for the event. Boechat Depo., Ex. G at 7-10 (ECF No. 37-1 at 7-10 (PAGE ID#s 820-23)). This individual testified that he and others are frustrated with the state of the country, and that when frustrated may get violent. Boechat Depo., Ex. G at 8-9 ECF No. 37-1 at 8-9 (PAGE ID#s 821-2).[7]

---

[7]    Plaintiff falsely swore under oath in his Interrogatory answers that he did not recall communicating with Mr. Boechat about UTR2. *See* Ex. H (Plaintiff's Discovery Responses) (ECF No. 31-4 at 187-89 (PAGE ID #s 783-85)). Yet, Plaintiff communicated with Mr. Boechat on Twitter, and later called Mr. Boechat in advance of his deposition. Ex. N (Gab.ai chat) (ECF No. 25-10 (PAGE ID # 475-76)); Boechat Depo., Ex. G at 4 (ECF No. 37-1 at 4 (PAGE ID # 817)).

PFF 71.  Despite the violence that occurred at the 2017 event, Plaintiff's proposed 2018 event is attracting attention among violent groups and individuals with violent inclinations. Kessler Depo., Ex. A at 72-74, 133-42 (ECF No. 31-4 at 101-03, 162-71 (PAGE ID#s 697-99, 758-67); Kessler Depo., Ex. A at 68-70, 72-73, 131-137 (ECF No. 31-4 at 97-99, 101-02, 160-66 (PAGE ID#s 693-95, 697-98, 756-62)).

PFF 72.  Plaintiff maintains that he has no control over who attends his event and that he is not responsible for them or their actions.  Kessler Depo., Ex. A at 71 (ECF No. 31-4 at 100 (PAGE ID# 696)).  Evidence confirms this.  Plaintiff stated at his deposition that he had to create a new Signal group chat because one of the participants, "Fred," spoke about bringing paramilitary to Plaintiff's proposed event.  Kessler Depo., Ex. A at 214-15 (ECF No. 68-1 at. 49-50, 72-73 (PAGE ID#s 1122-23, 1145-46)).  Despite his own alleged wishes, Plaintiff noted that Fred was added back to the group, multiple times, by another member of his group.  Kessler Depo., Ex. A at 215 (ECF No. 68-1 at 50 (PAGE ID# 1123)).  Plaintiff also stated that a person such as Brian Landrum, who he described as a friend he had known over a year, can be added to the group at a whim, without their consent or Plaintiff's ability to control it.  Kessler Depo., Ex. A at 216-17, 242-44 (ECF No. 68-1 at 51-52, 74-76 (PAGE ID#s 1124-25, 1147-49)).

PFF 73.  Plaintiff and the other people he communicates with on secret messaging platforms utilize those platforms to maintain secrecy. In doing so, they use aliases to hide their true identities.  Kessler Depo., Ex. A at 220-21, 245-46 (ECF No. 68-1 at 55-56, 77-78 (PAGE ID#s 1128-29, 1150-51)).

PFF 74.  Plaintiff's lack of knowledge as to who he is communicating with, and his inability to control who is added to his group of planners, is further evidence supporting the City's conclusion that Plaintiff is an unreliable and irresponsible event sponsor.

PFF 75.  Plaintiff recently admitted that the Unite the Right 1 rally was "much more of an extreme event than [he] intended because so many of the moderate elements did not want to be with the more extreme elements." Kessler Depo., Ex. A at 18.  He has also stated that holding his UTR2 event in Charlottesville is "perhaps…not the safest plan."  Kessler Depo., Ex. A at 183 (ECF No. 68-1 at 24 (PAGE ID # 1097)).

PFF 76.   Throughout the country, there is a pattern of violence in events like the one Plaintiff demands the court allow him to organize.  From Berkeley to Portland to Charlottesville, these events attract people interested in engaging in combat and other violence, rather than discourse, (Lewis Decl., Ex. D at 7 (ECF No. 31-2 at 6 (PAGE ID# 590)) and Plaintiff has been following these conflicts.  Lambert Depo., Ex. F at 8-9 (ECF No. 31-4 at 31-32 (PAGE ID#s 627-28)); Kessler Depo., Ex. A at 74 (ECF No. 31-4 at 103 (PAGE ID# 699)).  Plaintiff has asked this court for an extreme remedy so he can organize a nearly identical event to the violent and destructive event he held last year, despite the interest violent groups and individuals have in this event, or his inability and unwillingness to address any of Defendants' concerns.

### F.      The Militia Decree Does Not Resolve the City's Public Safety Concerns

PFF 77.  Plaintiff's decision to enter into the consent decree was a "tactical" decision unrelated to any commitment by Plaintiff that future events are intended to be peaceful.  ECF No. 53 at 5 (Page ID# 994).

PFF78.  The consent decree in the *Pennsylvania Light Foot Militia* case addresses only Plaintiff's actions regarding concerted conduct—not individual conduct.  Defendants' Sur-Reply Regarding Militia Case, ECF No. 53 at 5 (Page ID# 994).  Nor does the consent decree address activities by individuals or groups that are not subject to consent decrees.  Defendants' Sur-Reply Regarding Militia Case, ECF No. 53 at 5-6 (Page ID# 994-5).

PFF 79.  Plaintiff entered into the consent decree only after the Court held that the City had pled facts supporting the conclusion that as a result of Plaintiff's "past incidents and anticipated future events …present a substantial possibility or likelihood of public danger." Defendants' Sur-Reply Regarding Militia Case, ECF No. 53 at 6 (Page ID# 996).

PFF 80.  The consent decree does not require Defendants to ignore credible evidence of danger or threats to public safety when it made its decision to deny Plaintiff's permit application. Defendants' Sur-Reply Regarding Militia Case, ECF No. 53 at 8 (Page ID# 997).

## II.     PROPOSED CONCLUSIONS OF LAW

1.     This Court cannot take "judicial notice" of the findings in the litigation before Judge Conrad last year because that decision was vacated *nunc pro tunc* when Plaintiff chose to voluntarily dismiss the action.  *See Marex Titanic, Inc. v. Wrecked & Abandoned Vessel*, 2 F.3d 544, 547 (4th Cir. 1993)(dismissal  under Fed. R. Civ. P. 41(a)(1)(i) operates as a matter of law to "leave the parties as if no action had been brought at all," and thus "carrie[d] down with it previous proceedings and orders in the action, and all pleadings, both of plaintiff and defendant, and all issues, with respect to plaintiff's claim,") quoting *Dove v. CODESCO*, 569 F.2d 807, 809 n. 3 (4th Cir.1978) and citing *In re Piper Aircraft Distrib. Sys. Antitrust Litig.*, 551 F.2d 213, 219 (8th Cir. 1977)).

2.     "A preliminary injunction is an extraordinary remedy intended to preserve the status quo and prevent irreparable harm during the pendency of a lawsuit." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).  Such relief is granted only if the movant clearly establishes her entitlement to such relief.  *Di Biase.*, 872 F.3d at 230 (citing *Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 499 (4th Cir. 1981)).

3. To establish such relief, a movant must demonstrate that she is likely to succeed on the merits; is likely to suffer irreparable harm in the absence of preliminary relief; the balance of equities favors granting a preliminary injunction; and granting a preliminary injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The movant bears the burden to show that each factor supports her motion. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991); *see also Joyner v. Swiney*, No. 7:13-cv-00227, 2013 WL 3279548, at *2 (June 27, 2013 W.D. Va.); *Doe v. Pittsylvania Cnty.*, 842 F. Supp. 2d 927, 930 (W.D. Va. 2012) (preliminary injunction cannot be granted unless "all four of these elements are met.").

4. A preliminary injunction is "never awarded as of right;" rather it "is a matter of equitable discretion." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Given its extraordinary nature, a preliminary injunction is only granted in the limited circumstances which clearly demand such relief. *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013) (*en banc*).

5. A "mandatory" injunction is an injunction that alters the status quo. *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 235-36 (4th Cir. 2014) (quoting *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013)).

6. Courts conduct an even "more searching" review when a movant seeks a mandatory injunction. *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003)). Such relief is "warranted only in the most extraordinary circumstances," see *Taylor v. Freeman*, 34 F.3d 266, 270 n. 2 (4th Cir. 1994); *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980)), and is disfavored. *Id. see also Trex Company, Inc. v. CPG Int'l LLC*, 2017 WL 3272013, at *9

(W.D. Va. 2017); *Volvo Group North America, LLC v. Truck Enterprises, Inc.*, 2016 WL 1479687, at *6 (W.D. Va. 2016).

7.      To succeed on a motion for a mandatory preliminary injunction, the movant must "show that the 'law and facts *clearly favor* [her] position, not simply that [she] is likely to succeed." *Dynamic Aviation Group Inc. v. Dynamic Int'l Airways, LLC*, 2016 WL 1247220, at *5 n. 3 (W.D. Va. 2016) (emphasis in original) (quoting *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

8.      Plaintiff bears the burden of demonstrating that he is likely to succeed on the merits; is likely to suffer irreparable harm in the absence of preliminary relief; the balance of equities favors granting a preliminary injunction; and granting a preliminary injunction is in the public interest because he filed the motion seeking a preliminary injunction.

9.      Plaintiff seeks a mandatory preliminary injunction because he has asked this Court to alter the status quo by granting him a permit to use Emancipation Park on August 11 and 12, 2018. Accordingly, Plaintiff bears the burden of showing that the law and facts clearly favor his position.

10.     Plaintiff has failed to show that the law and facts clearly demonstrate that he is likely to succeed on the merits; is likely to suffer irreparable harm in the absence of preliminary relief; the balance of equities favors granting a preliminary injunction; and that granting a preliminary injunction is in the public interest.

11.     Plaintiff's memorandum in support of his motion for a preliminary injunction did not address whether he is likely to suffer irreparable harm in the absence of preliminary relief; whether the balance of equities favors granting a preliminary injunction; or whether granting a preliminary injunction is in the public interest.  Accordingly, Plaintiff failed to address three of

30

the four factors for which he bears the burden of demonstrating that the law and facts clearly favor granting a preliminary injunction. As a result, Plaintiff did not meet his burden to show that each of the factors clearly favors granting his motion.

12.     By failing to address these factors in his brief in support of his motion for preliminary injunctive relief, Plaintiff has waived his right to argue them. *Lismont v. Alexander Binzel Corp.*, 2014 WL 12527239, at *1 (E.D. Va. 2014) (courts do not consider arguments raised after the opening brief).

13.     Plaintiff's attempt to address these factors in his reply brief or at hearing, therefore, is improper. Accordingly, any such belated arguments do not establish that Plaintiff has met his burden to prove that the law and facts clearly favor his motion. Therefore, Plaintiff has failed to meet his burden and cannot be granted the relief he seeks.

14.     None of the factors clearly favor the granting of a preliminary injunction. Plaintiff asserts that he has suffered irreparable harm because Defendants allegedly infringed upon his First Amendment rights by denying his permit application. Plaintiff has undercut his own unsupported assertion by admitting that he will only have two dozen people at his event if the City is forced to grant him a permit. Plaintiff does not need a permit for a gathering of that size. Since Plaintiff can hold his event without a permit, he will suffer no irreparable harm from the denial of his motion for a preliminary injunction.

15.     Where a municipality demonstrates that legitimate public safety concerns would arise if a preliminary injunction would be granted, courts have denied a motion for preliminary injunctive relief on the basis of the balance of the equities and the public interest. *See Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 17 (1st Cir. 2004) (denying a preliminary injunction motion brought by a group planning to protest the Democratic National Convention because the

"balance of harms [was] inconclusive" since "the safety, security, and logistical concerns voiced by the City were real" and the public interest in the "freedom of political expression" did not outweigh its interest in "making public safety a reality and ensuring that important political events are able to proceed normally"). *See also Tracy Rifle and Pistol LLC v. Harris*, 118 F. Supp. 3d 1182 (E.D. Cal. 2015) (denying a motion for preliminary injunction against a California law restricting certain on premise advertisements by gun retailers, despite finding that movant was likely to win on the merits, because the public interest and balance of the equities favored denial).

16.     A preliminary injunction would raise legitimate public safety concerns, so the balance of harms and the public interest do not favor granting a preliminary injunction. A court may also consider the "practical effects of granting or denying preliminary injunctive relief." *Bl(a)ck Tea Soc'y*, 387 F.3d at 17. Plaintiff originally sought to organize an event to reprise an event that he organized the prior year, which led to massive public disorder, which Plaintiff actively encouraged, and helped promote.  This year Plaintiff sought even more time for his event—32 hours. Plaintiff has been planning his proposed event in secret, using communications applications through which he can erase messages. Other people interested in attending his event are discussing bringing violent organizations to the event, an occurrence Plaintiff admits he could not prevent or control. Plaintiff has taken no responsibility for his August 2017 event, nor has he addressed any of Defendants' public safety concerns regarding his proposed August 2018 event.

17.     The consent decree into which Plaintiff entered with the City does not mollify Defendants' public safety concerns because it only applies to Plaintiff's action regarding concerted conduct; it does not address individual conduct so it provides no defense against harm

32

caused by individuals. Additionally, Plaintiff has a clear record of being an untrustworthy event sponsor, so his protestations of peacefulness are unavailing, and his ability to comply with the consent decree is a serious concern. The concern is substantiated by Plaintiff's failure to follow, and ensure his supporters followed, agreed-upon security plans with the City last year. Plaintiff has testified that he is not responsible for the conduct of others at his event; he cannot control who attends his event; and he blames others for his loss of control of his event last year, which led to significant harm to the City. Furthermore, Plaintiff entered into the consent decree after Judge Moore ruled that the City adequately alleged that Plaintiff knew or intended for various techniques taught to his demonstrators to be used in a civil disorder, and that the Plaintiff's actions presented a substantial possibility of public danger as a result of his past actions. The ability to punish violations of the decree by contempt does not assure the safety of the City's community because any such punishment would likely occur after the community was harmed.

18. Nor does the consent decree preclude consideration of Plaintiff's role in causing the public safety crisis at his event last year. A settlement agreement can have a preclusive effect but any such effect is "no greater than the preclusive effect of the agreement itself" and "the preclusive effect of a settlement agreement should be measured by the intent of the parties." *U.S. ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 913 (4th Cir. 2013). The consent decree does not have a preclusive effect regarding the City's public safety concerns with Plaintiff's proposed event, and in fact says nothing about whether any permit application will or will not be granted. Accordingly, the consent decree does not support any factor for which Plaintiff bears the burden of persuasion on his motion.

19. Defendants also properly considered all the circumstances that would arise if it granted Plaintiff's permit application, such as: the potential for further economic losses incurred

by the City's downtown businesses due to perceptions that the area is unsafe, hostile, or undesirable; further disruption to the City's businesses and residents; further harm to the City's reputation; and the significant expenditure of municipal resources that would be required were Plaintiff's permit application granted. These harms establish that the effect of granting Plaintiff preliminary injunctive relief is not in the public interest. The harm to Plaintiff, therefore, is far outweighed by the harm to Defendants if a preliminary injunction is granted, and public interest favors denying the motion.

20.  Assuming that likelihood of success on the merits remains relevant given Plaintiff's failure to properly address and show any of  the other three factors, Plaintiff has not demonstrated that he is likely to succeed on the merits. He has not provided any evidence that establishes that City Manager Maurice Jones denied Plaintiff's permit application on the basis of viewpoint or content-based discrimination. *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015) (holding that a municipal regulation that subjected signs to different restrictions based on the content contained in the signs constitutes content-based discrimination); *see also Lefemine v. Wideman*, 672 F. 3d 292 (4th Cir. 2012) (holding that law enforcement officers violated the First Amendment by threatening criminal sanctions against picketers on the basis the content of the picketers' signs).  A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages, but not others. *Renton v. Playtime Theatres, Inc.*," 475 U.S. 41, 47-48 (1986).  The purpose of Defendants' permit rules are to protect public safety and to do so in a manner that effectively utilizes public resources.  Accordingly, their rules are content neutral; any incidental effect on Plaintiff, therefore, is not content-based discrimination.

Case 3:18-cv-00015-NKM-JCH   Document 74   Filed 07/24/18   Page 34 of 41   Pageid#: 1191

21.     The government does not engage in a "heckler's veto" when the speaker's conduct poses a threat of violence. *Christian Knights of Ku Klux Klan v. Stuart*, 934 F.2d 318 (4th Cir.1991). There is substantial evidence that Plaintiff invited and welcomed violence at his event last year, which raises a legitimate public safety concern that Plaintiff will welcome and encourage violence at his proposed event.

22.     The First Amendment does not protect violence, nor the ratification, or authorization of violence. *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 916, 927 (1982). Neither does The First Amendment protect conspiracies to engage in violence. *United States v. Amawi*, 695 F.3d 457, 482 (6th Cir. 2012) ("Forming an agreement to engage in criminal activities—in contrast with simply talking about religious or political beliefs—is not protected speech.") Nor does The First Amendment protect physical assaults committed for allegedly expressive reasons. *Wisconsin v. Mitchell*, 508 U.S. 476, 484 (1993). While the First Amendment protects artistic expression, it does not protect "direct incitements to violence." *Berger v. Battaglia*, 779 F.2d 992 (4th Cir. 1985). Plaintiff both encouraged and ratified violence at his event last year. Defendants, therefore, have not engaged in a heckler's veto in denying Plaintiff's permit application.

23.     Plaintiff's request for the Court to take judicial notice of *Kessler v. City of Charlottesville, Virginia*, No. 3:17CV00056, 2017 WL 3474071, at *3 (W.D. Va. Aug. 11, 2017) as evidence that the City engaged in viewpoint discrimination is improper because Plaintiff voluntarily dismissed that action, thereby "leav[ing] the parties as if no action had been brought at all," and thus "carrie[d] down with it previous proceedings and orders in the action, and all pleadings, both of plaintiff and defendant, and all issues, with respect to plaintiff's claim." *Marex*

*Titanic*, 2 F.3d at 547 (quoting *Dove v. CODESCO*, 569 F.2d 807, 809 n. 3 (4th Cir.1978) and citing *In re Piper Aircraft Distrib. Sys. Antitrust Litig.*, 551 F.2d 213, 219 (8th Cir. 1977)).

24.     Because Plaintiff has not established that his permit denial was based on the content of his message or on viewpoint discrimination, which are his only claims, his showing is insufficient to establish any likelihood that he can show a violation of the First Amendment, and does not shift any burden to the Defendants.  *See, e.g, Ross v. Early*, 746 F.3d 546, 560-61 (4th Cir. 2014) (officer not liable for viewpoint discrimination where the record was "devoid of any evidence from which a reasonable juror could find that Officer Early arrested Appellant with a content or viewpoint based discriminatory purpose."); *Pahls v. Thomas*, 718 F.3d 1210, 1230 (10th Cir. 2013) ("The Supreme Court has made clear that, for a discrimination claim rooted in the First Amendment, a plaintiff must show that a government official 'acted with discriminatory purpose,'" *i.e.*, that he acted "because of, not merely in spite of, the action's adverse effects upon an identifiable group." (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 676,  (2009)); *Covenant Media of SC, LLC v. City of North Charleston*, 493 F.3d 421, 432-33 (4th Cir. 2007) (reversing district court finding that a regulation was content-based; "The principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." (*citing Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)).

25.     Assuming that Plaintiff had made a showing sufficient to shift the burden to Defendants, which he has not, a municipality may deny a permit based on one or more of the reasons set forth in its ordinance and "decisions concerning the resources required to maintain order and safety under varying circumstances necessarily call for the exercise of discretion based on law enforcement expertise and familiarity with the potential dangers facing a locality."  *Yates*

36

*v. Norwood*, 841 F. Supp. 2d 934, 942 (E.D. Va. 2012). A municipality may also consider past experience when denying a permit application. *Bl(a)ck Tea Soc'y v. City of Boston*, (affirming that the denial of a preliminary injunction sought by the demonstrators at a political convention to overturn restrictions on their ability to protest based in part on "recent past experience with large demonstrations" and holding that a municipality may consider past experience as long as the "inferences drawn from past experience are plausible."); *United for Peace and Justice (UPJ) v. City of New York*, 243 F.Supp.2d 19 (S.D.N.Y. 2003) (upholding New York City's denial of a permit for a protest based on the lack of information it had about the event, the large and uncertain number of participants, the fact it did not know who the organizers were, and its inability to appropriately plan for adequate security, noting that "police concerns about security threats posed for the United Nations are far from theoretical.").

26. Defendants denied Plaintiff's permit based on evidence, experience with Plaintiff, and a review of the City's resources and its ability to accommodate Plaintiff's proposed event, all of which are proper bases for denial. Plaintiff's original application presented public safety issues and resource concerns on its face by providing the same unsupported estimate of attendees and lack of structure and details as did his permit application for his August 2017 event. His application for August 2018 sought to reserve the park for 4.5 times longer than last year's deadly event, which would require substantial public resources. The application also failed to address any of the public safety issues raised by last year's event, to provide specified activities, and it sought use of the park outside of operating hours. Further Plaintiff has not addressed any of the concerns Defendants raised in the denial letter, or taken any responsibility for his conduct at last year's event. Moreover, Defendants' past experience with Plaintiff supports their decision to deny Plaintiff's permit. That past experience demonstrates that Plaintiff bore substantial

37

responsibility for the violence that occurred at his event by failing to supervise the individuals to whom he delegated security responsibilities—people who reneged on the security agreements with law enforcement and actively encouraged and welcomed violence. These experiences raise real public safety concerns. Additionally, Plaintiff has constantly altered the fundamental elements of his proposed event, including potential events and attendees. Such uncertainty further underscores Defendants' concerns about public safety and the resources need to ensure it.

27. A municipality is empowered to establish regulations and ordinances establishing the rules governing the approval of permits for events on public property. *Cox v. City of Charleston*, 416 F.3d 281, 284 (4th Cir.2005) (holding that a City may "set[] forth regulations and ordinances requiring advance parade permits as a traditional exercise of control by the local government."). Defendants have established a standard operating procedure which governs the approval and denial of permit applications. Plaintiff's original application did not meet the necessary terms under the standard operating procedure to be approved because it sought to reserve Emancipation Park outside of its operating hours as laid out in the standard operating procedure. Moreover, Plaintiff's application raised public safety concerns, and concerns about his ability to be responsible for his proposed event. "No one could seriously dispute that the government has a significant interest in maintaining public order"; "indeed this is a core duty that the government owes its citizens." *Menotti v. City of Seattle,* 409 F. 3d 1113, 1131 (9th Cir. 2005). Plaintiff could have, but did not, amend his application to address these concerns, concerns which are at the core of Defendants' interests.

28. Plaintiff has not shown content-based or viewpoint discrimination, which were his sole claims. Assuming, however, that the issue of discretion was before the Court, as in *Green v. City of Raleigh*, 523 F.3d 293 (4th Cir. 2007), the City properly exercised its discretion to assess

the public safety concerns raised by the Plaintiff's application and made a sound judgment based on the evidence that the permit should be denied. A city's determination that a particular rally poses an unacceptable public safety risk necessarily involves judgment and an exercise of discretion, and if properly supported by an evidentiary foundation as here does not violate the First Amendment.

29.     The City's decision to deny Plaintiff's permit was content-neutral, which position Plaintiff has not challenged. Therefore, the burden shifting at issue in *Reynolds v. Middleton*, 779 F. 3d 222 (2015) does not apply. Moreover, Plaintiff has not offered any competent evidence of viewpoint discrimination or content based regulation.

30.     Assuming *Reynolds v. Middleton*, 779 F. 3d 222 (2015), did apply to the challenge Plaintiff actually brought, *Reynolds* favors the City. *Reynolds* supports the City's interest in public safety as a matter of common sense and logic, even without empirical evidence. "[C]ommon sense and the holdings of prior cases have been found sufficient to establish … that the government has a significant interest in public safety." *Id.*, at 227. Further, *Reynolds* holds that a decision by the City requires some evidentiary support, of which there is an abundance in this record. When challenged, a government must produce evidence that the challenged regulation redresses past harms or prevents future ones. *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 515 (4th Cir. 2002). Thus, even assuming Plaintiff had properly challenged the permit denial as content neutral, which he has not, such challenge would fail under the reasoning of *Reynolds*.

31.     Plaintiff knowingly failed to preserve, and/or actively destroyed evidence he knew would be relevant to an issue in this action. In such cases an adverse inference against

39

Plaintiff is warranted regarding what the destroyed materials would show.  *Vulcan Materials Co.*

*v. Massiah*, 645 F.3d 249, 259-60 (4th Cir. 2011).


Dated: July 24, 2018                                    Respectfully submitted,


                                                        /s/ John Longstreth

                                                        Linda Odom (VSB No. 77149)
                                                        John Longstreth (*pro hac vice*)
                                                        Daniel S. Cohen (VSB No. 92163)
                                                        **K&L Gates LLP**
                                                        1601 K St. NW
                                                        Washington, D.C. 20006
                                                        Tel: (202) 778-9000
                                                        Fax: (202) 778-9100
                                                        Email: linda.odom@klgates.com
                                                                john.longstreth@klgates.com
                                                                dan.cohen@klgates.com


                                                        Lisa A. Robertson
                                                        Chief Deputy and Acting City Attorney (VSB No. 32486)
                                                        Sebastian Waisman (VSB No. 91665)
                                                        **Office of the City Attorney**
                                                        P.O. Box 911
                                                        Charlottesville, VA 22902
                                                        Tel: (434) 970-3131
                                                        Fax: (434) 970-3022
                                                        Email: robertsonl@charlottesville.org
                                                                waismans@charlottesville.org


                                                        *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2018, the foregoing was filed electronically with the

Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing (NEF)

to counsel of record in this matter.

/s/ Linda Odom
Linda Odom (VSB No. 77149)
**K&L Gates LLP**
1601 K St. NW
Washington, D.C. 20006
Tel: (202) 778-9000
Fax: (202) 778-9100
Email: linda.odom@klgates.com