# EXHIBIT B DEFENDANTS' FINDINGS OF FACT AND CONCLUSIONS OF LAW

Exhibit B is the declaration of Maurice Jones.

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | |
|---|---|
| JASON KESSLER | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:18cv00015-NKM-JCH |
| | ) |
| CITY OF CHARLOTTESVILLE | ) |
| MAURICE JONES | ) |
| Charlottesville City Manager | ) |
| In his individual and official capacities | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF MAURICE JONES

Maurice Jones hereby declares under penalty of perjury as follows:

1. I am the City Manager for the City of Charlottesville, Virginia, and as such serve as the Director of Public Safety and Emergency Management for the City. I have served in that capacity for eight years, and have also been the Assistant City Manager. I have 17 years of experience working in local government. I make this declaration in support of Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction. I was also deposed in connection with the Motion and this declaration focuses on matters as to which I was not questioned.

2. In May 2017, Plaintiff applied for a permit for an August 12, 2017 event in Emancipation Park, formerly known as Lee Park ("Park"). Pursuant to the City's usual procedures, the Plaintiff's 2017 application was sent to various City offices responsible for police protection, fire, emergency medical services, street closings, and other related matters. The City relies on event organizers to provide it with accurate information on the nature

1

of the event, the planned activities, any special security concerns, and any special equipment or other resources needed.

3. The City allowed Plaintiff to proceed with his event even though he had recently participated in a well-publicized torchlit rally with Richard Spencer, a figure whose political views are anathema to many Charlottesville citizens.

4. The City followed the same procedure and granted the Ku Klux Klan a permit for an event on July 8, 2017. The Klan organizer cooperated with the CPD's plan for ensuring the security of the Klan demonstrators at the event. There was an agreed upon "staging area" where the police would meet the Klan members and escort them into Justice Park and an agreed upon plan for escorting the Klan out of the park and back to their vehicles. Although the exit plan had to change due to counter protestor conduct, the event concluded without any Klan - counter protestor violence.

5. As the date for the August 12, 2017 event neared, the City became increasingly concerned about the safety implications of the event. The number of likely attendees was predicted to be far in excess of the 400 claimed in the application, and the Park was ill-suited for such a large crowd, particularly given a cumulative body of intelligence gathered by the Charlottesville Police Department (CPD) that the crowd would be not only extremely large but armed. There were differing views on whether moving the event at that late date would create additional security issues, but my public safety judgment was ultimately that moving it was the right decision. Tragically, much of our intelligence turned out to be accurate, and the event led to a public safety emergency unprecedented in the City's history, with rioting, bloodshed, and death.

2

6. There was considerable cause for reflection after the August 12, 2017 event, and the City commissioned an extensive report to offer suggestions on improving its capabilities. That report pointed out shortcomings in the response by the City and the Virginia State Police, but it did not absolve the Plaintiff and his supporters of blame. To the contrary, we learned quickly that the Plaintiff and his security personnel had refused to comply with a plan that the CPD had developed and discussed with them for their safety. The plan that Plaintiff failed to follow was similar to that used by police to manage the Klan event, and Plaintiff's failure to abide by the plan and police requests significantly hampered the police's ability to manage the August 12, 2017 event.

7. The Plaintiff's role in unlawful paramilitary activities and threats to public safety also caused the City to name him as a defendant in a lawsuit filed in October, 2017 seeking to enforce the laws against unlawful militia activity, and his role in the violence led private plaintiffs to make him the lead defendant in a lawsuit also filed in October, 2017 seeking damages for the significant harm caused by the event.

8. On November 27, 2017, Plaintiff filed an application to hold an event in the Park on the first anniversary of the August 12 violence. The application contained the same unsupported estimate of 400 attendees that Plaintiff had made the year before and sought a permit for 32 hours over two days, or four full police shifts. It did not address Plaintiff's role in the violence that resulted from his 2017 event. After consulting with public safety officials, and reviewing evidence of the Plaintiff's role in that event, I determined to deny the permit on grounds of public safety, Plaintiff's demonstrated lack of ability to manage and be responsible for an event of this type, and his failure to abide by the permitting rules and regulations.

9. Former Mayor Signer and Former Vice Mayor Bellamy had no involvement in my decision to deny the Plaintiff's permit, nor did any other elected official.

10. The City has not granted other permits for use of the Park or of nearby parks at or near the time of Plaintiff's event.

11. Soon after the denial of his permit, Plaintiff made a freedom of information act request for the City's actions on other permit requests. We provided him access to all of the information he requested. I have reviewed the Plaintiff's preliminary injunction papers and see that he has made no allegations that the City treated other similarly-situated permit applicants differently or more favorably than they treated him.

12. Plaintiff has never provided me any evidence to counter the evidence the City has collected about his role in the violence last August 12 or his lack of ability to responsibly manage an event of this magnitude, and I am not aware he provided any such evidence to anyone else in the application process. About seven weeks after the denial we received a letter from Plaintiff's attorney demanding a permit under unspecified terms and conditions, but it also did not address the public safety and responsibility concerns in the denial. Five weeks after that the Plaintiff sued, and six more weeks after that he served his complaint. Because Plaintiff did not serve his complaint until four and one half months after the permit denial, this litigation has been conducted on a very expedited basis. Despite the Court's very prompt schedule, a decision in this case will be issued only 2-3 weeks before the planned event. If this decision alters the status quo, the short time remaining before the event will significantly impair the City's efforts to plan for the event.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

*Maurice Jones* (signature)
Maurice Jones

5