# EXHIBIT G TO DEFENDANTS' FINDINGS OF FACT AND CONCLUSIONS OF LAW

Exhibit G is the transcript of the deposition of Marcus Boechat conducted on June 29, 2018.

## Page 1

```
                UNITED STATES DISTRICT COURT
                for the Western District of Virginia
                            Docket No. 3:18-cv-00015
* * * * * * * * * * * * * * *
JASON KESSLER,              *
                            *
            Plaintiff,      *
                            *
    vs.                     *
                            *
CITY OF CHARLOTTESVILLE and *
MAURICE JONES,              *
                            *
            Defendants.     *
                            *
* * * * * * * * * * * * * * *
```

DEPOSITION of MARCUS BOECHAT

BEFORE: Christine Fraga Thornton, RPR,
Notary Public, at the offices of Hale & Hamlin,
Ellsworth, Maine, on Friday, June 29, 2018, beginning
at 9:40 a.m.

APPEARANCES:

James Kolenich, Esq.        For the Plaintiff
John Longstreth, Esq.       For the Defendant
Justin Bennett, Esq., and
Barry Mills, Esq.           For the Deponent

DON THOMPSON & ASSOCIATES, INC.
Court Reporting and Video Conferencing
207-394-3900 - dtreport@myottmail.com - www.dtamainereporter.com

## Page 2

INDEX OF APPEARANCES

For the Plaintiff, Jason Kessler: (via speakerphone)

James Kolenich, Esq.
jek318@gmail.com

For the Defendants, City of Charlottesville,
and Maurice Jones:

John Longstreth, Esq.
K&L Gates, LLP
16-1 K Street NW
Washington DC 20006
202-778-9020
John.longstreth@klgates.com

For the Deponent, Marcus Boechat:

Justin Bennett, Esq., and Barry Mills, Esq.
HALE & HAMLIN
4 State Street
PO Box 729
Ellsworth ME 04605
207-667-2561
justin@halehamlin.com
barry@halehamlin.com

## Page 3

INDEX

EXAMINATION
Witness Name                                        Page
MARCUS BOECHAT
    Direct By Mr. Longstreth ........................ 4

EXHIBITS
Exhibit      Description                          Marked
No. 53       Subpoena to testify ..................... 6
No. 54       Document subpoena ....................... 7
No. 55,56    Screenshots of postings ................ 15
No. 57       Facebook activity log .................. 15
No. 58       Screenshot of posting .................. 21
No. 59       Screenshot of posting .................. 22
No. 60       Screenshot of posting .................. 26
No. 61       Screenshot of posting .................. 28
No. 62       Home screen screenshot ................. 42

## Page 4

(This deposition was taken before Christine Fraga Thornton, RPR, Notary Public, at the offices of Hale & Hamlin, Ellsworth, Maine, on Friday, June 29, 2018, beginning at 9:40 a.m.)

* * * * *

(The deponent was administered the oath by the Notary Public.)

* * * * *

MARCUS BOECHAT, called, after having been duly sworn, on his oath deposes and says as follows:

DIRECT EXAMINATION

BY MR. LONGSTRETH:

Q. Mr. Boechat, could you state your name, date of birth, and address for the record, please?

A. Marcus A. Boechat, 270 Reach Road, and 61062.

Q. Okay.

MR. BENNETT: Apologies. This is Attorney Justin Bennett. Just for housekeeping, I just wanted to clarify. The scope of the deposition today concerns all communications between Mr. Boechat and Mr. Kessler, the plaintiff, and between Mr. Boechat and any other person or organization concerning the proposed event, as well as all communications concerning Mr. Boechat's activities in the City of Charlottesville that occurred in May, July, or August, including the 2017 event.

**Page 5**

1  MR. LONGSTRETH: Okay.
2  MR. BENNETT: So I think we have an
3  agreement; that's the scope of the deposition.
4  MR. LONGSTRETH: Okay.
5  MR. BENNETT: There may be some smaller
6  collateral issues we can deal with around that. Is
7  that agreed?
8  MR. LONGSTRETH: Yeah, we'll try to -- we'll
9  try to observe what you agree to be the proper scope.
10 If we have any questions about it, obviously, there's a
11 fairly wide range of relevance in federal proceedings,
12 but we have no intention to get into purely collateral
13 matters.
14 MR. BENNETT: Wonderful.
15 And then the other issue I've got, and my
16 understanding is that objections based on relevance are
17 generally preserved for the record without having to be
18 raised each time.
19 MR. LONGSTRETH: Okay.
20 MR. BENNETT: If we can proceed on that --
21 MR. LONGSTRETH: That's good.
22 MR. BENNETT: If that's fine with you.
23 MR. LONGSTRETH: Yeah. Okay.
24 MR. BENNETT: Thank you.
25 //

**Page 6**

1  BY MR. LONGSTRETH:
2  Q.  Mr. Boechat, you are here pursuant to a subpoena; is
3      that correct?
4  A.  Yes.
5      MR. LONGSTRETH: Okay. And I'm, just for the
6  record, going to mark the subpoena as -- we're going to
7  start with Defendant's Exhibit 53.
8      (Deposition Exhibit No. 53, subpoena to testify,
9  marked for identification.)
10     MR. LONGSTRETH: I'm going to say the
11 convention we'll have here is, what I'll do is mark the
12 exhibit, and then she'll give you the marked exhibit so
13 that, Mr. Boechat, you can look at that, and I have
14 a --
15     MR. BENNETT: Copy?
16     MR. LONGSTRETH: -- copy for your attorney.
17 And feel free to take some time to look at
18 the exhibits when "you're handed to them" [sic]. Let
19 me know when you're ready for questions.
20     MR. BENNETT: This is the document subpoena,
21 isn't it, you're referring to?
22     MR. LONGSTRETH: Yes, it is. Yeah.
23 And actually, can I just see that for a
24 second just to make sure? Actually, no, I gave you a
25 copy -- I'm sorry. This is the --

**Page 7**

1      MR. BENNETT: Want that back?
2      MR. LONGSTRETH: He's got the subpoena to
3  testify, and then, if I can mark the document subpoena,
4  and I have an extra copy somewhere.
5      MR. LONGSTRETH: So I'll have this marked as
6  Defendant's 54. I'm sorry.
7      (Deposition Exhibit No. 54, document subpoena,
8  marked for identification.)
9      MR. LONGSTRETH: Here's an extra copy of the
10 document subpoena with the affidavit of service, and an
11 extra copy of the deposition subpoena, so you can have
12 those.
13     (Colloquy off the record.)
14 BY MR. LONGSTRETH:
15 Q.  So Mr. Boechat, did you receive a copy of this document
16     subpoena? I'm just going to talk about the document
17     subpoena --
18 A.  Yes.
19 Q.  -- now, which has been marked as 54.
20     And you saw that that required you to produce
21     certain documents?
22 A.  Mm-hmm.
23 Q.  And you provided -- I'm sorry. Let me go back to a
24     preliminary -- have you been deposed before?
25 A.  No.

**Page 8**

1  Q.  Okay. I'll just do very briefly kind of the rules.
2      I'll ask you questions. If you don't understand any of
3      my questions or need clarification, just tell me and
4      I'll try to rephrase it in a more understandable way.
5      Your attorney may object. Those objections are
6      for purposes of protecting the record. Unless he
7      directs you not to answer, you are to answer the
8      question subject to the "deposition" [sic].
9      And then, the thing that reminded me of all of
10     this, you have to give verbal answers, yes or no. You
11     can't go "mm-hmm" or "uh-huh." Even though this seems
12     rather conversational in approach, for purposes of the
13     record, we have to make sure that we have verbal
14     answers.
15     Do you understand all of that?
16 A.  Yes.
17 Q.  Do you have any other questions?
18 A.  No.
19 Q.  Okay. So what did you do to search for documents in
20     response to the subpoena?
21 A.  The only conceivable thing I could think of --
22 Q.  Mm-hmm.
23 A.  -- linking me to this Kessler guy, who I've never heard
24     of before --
25 Q.  Mm-hmm.

**Page 9**

1  A.   -- was a post which he made, and that I subsequently
2       reposted —
3  Q.   Mm-hmm.
4  A.   -- from the general feed at Gab.ai.
5  Q.   Okay.
6  A.   And well, yeah, that's it.
7  Q.   Okay. Did you make — do you have a laptop computer?
8  A.   Yes.
9  Q.   Did you make an effort to search your laptop computer
10      for any communications concerning Jason Kessler,
11      Charlottesville, or any of his events?
12 A.   I don't know anything about Charlottesville. I didn't
13      know about the previous one, whatever that whole thing
14      was about.
15 Q.   Okay.
16 A.   He — well, I'll just tell you because it -- he sent me
17      his phone number on Gab.ai, which I thought was very
18      forward, and I personally have never responded to any
19      sort of direct communication like that or an appeal for
20      direct communication.
21 Q.   Okay.
22 A.   I thought that was very bizarre, and I was actually
23      kind of put out by it.
24 Q.   Okay.
25 A.   And it must have been maybe a week later, I can't

**Page 10**

1       remember, that he called me on the phone, and very
2       pugnacious, very truculent, kind of gleefully asking me
3       if I had gotten my subpoena yet. And I said, What are
4       you — who are you and what are you talking about?
5  Q.   Mm-hmm.
6  A.   So and he kept on going with this very truculent
7       attitude. And I thought, you know, I don't know who
8       this guy is, but I'm hanging up on you. So I hung up
9       on him, and that was the end of that.
10 Q.   Okay.
11 A.   But —
12 Q.   Actually, if I could, I normally don't like to cut off
13      a witness in the middle of an answer, but could I — I
14      want to focus on the conversation with Mr. Kessler
15      while you're there, and then we can get on — actually,
16      just what was the next subject you were going to talk
17      about, just so we make sure that you get there. You
18      said "but"?
19 A.   I'm done.
20 Q.   Okay. Good.
21          Then so this call from Mr. Kessler, you said it
22      was about a week after he asked you for "his" [sic]
23      phone number?
24 A.   Something like that.
25 Q.   Okay.

**Page 11**

1  A.   I truly cannot recall --
2  Q.   Okay.
3  A.   -- how many days it was.
4  Q.   About how long ago do you think it was?
5  A.   I don't know. Two or three weeks ago? I don't know.
6       I don't — I really don't —
7  Q.   Okay.
8  A.   I don't keep track of time very well.
9  Q.   Okay. And was that call made -- well, let me ask you
10      this question. Do you know how he had your phone
11      number?
12 A.   I have no idea.
13 Q.   Okay. Which phone number did he call you at?
14 A.   My home phone number.
15 Q.   Okay. And what's that?
16 A.   207-359-8092.
17 Q.   Okay. And do you know if that phone number is publicly
18      available?
19 A.   I presume it's in the phone book. Yeah, sure.
20 Q.   Okay. Did he tell you how he had your phone number?
21 A.   No. No.
22 Q.   Okay. So you mention that he was truculent. What do
23      you mean by "truculent"?
24 A.   Well, I thought that was a pretty direct word.
25 Q.   No. And I was actually going to add that to the

**Page 12**

1       question. I don't -- the purpose of my question is not
2       to get you to define the word "truculent." It's for
3       you to describe what in his conversation or manner
4       caused you to describe him as truculent. If you could
5       describe Mr. Kessler's conduct that you describe as
6       truculent.
7  A.   Well, he was speaking to me about Charlottesville,
8       which I know nothing about.
9  Q.   Mm-hmm.
10 A.   And I asked him, "Well, what are you talking about?"
11      And you know, at first, I was, you know, "Who are you?
12      What are you talking about?"
13 Q.   Mm-hmm.
14 A.   The conversation did not last long --
15 Q.   Mm-hmm.
16 A.   -- because his whole attitude was so high-handed and
17      gleeful, you know, in a very mean sort of way, and I
18      thought, shoot, I'm not going to continue to talking to
19      you --
20 Q.   Okay.
21 A.   -- good-bye.
22 Q.   Okay. Did he ask you to do anything?
23 A.   No. I wouldn't characterize that conversation as a
24      directive to do anything.
25 Q.   Okay.

**Page 13**

1  A.  I don't — I mean, he mentioned Charlottesville —
2  Q.  Okay.
3  A.  — but that's —
4  Q.  Okay. Did he state the purpose of his call?
5  A.  No.
6  Q.  Okay. Did he refer to the subpoena you had received?
7  A.  I had not received it yet.
8  Q.  Okay. Did he refer to a subpoena that you might be
9      receiving?
10 A.  I suppose.
11 Q.  I'm just asking you what you recall from the
12     conversation.
13 A.  I suppose he knew that a subpoena was coming and was
14     telling me that I ought to expect it, I guess.
15 Q.  Okay. Did he, in fact, tell you that, do you recall?
16 A.  He said straight out, "Have you gotten a subpoena yet?"
17 Q.  Okay. And what did you respond?
18 A.  "What are you talking about?"
19 Q.  Okay. And then what did he say?
20 A.  My memory's not like that.
21 Q.  Okay.
22 A.  I mean, you know, he might have mentioned, you know,
23     some upcoming Charlottesville thing, but I personally,
24     you know —
25 Q.  Mm-hmm.

**Page 14**

1  A.  — as I said, I —
2  Q.  Mm-hmm. I'm sorry. As you said?
3  A.  Well, I mean, you know, he — as I said, his whole
4      approach was very combative, and therefore, I hung up
5      shortly thereafter.
6  Q.  Okay. Was he urging you not to comply with the
7      subpoena?
8  A.  We never got that far, you know.
9  Q.  Okay. Did he say anything else about the subpoena that
10     you recall?
11 A.  No. No. That was it. I mean, it didn't last much
12     longer beyond that.
13 Q.  Okay. Was that the first time you had spoken to
14     Mr. Kessler?
15 A.  It's the only time I ever spoke to Mr. Kessler.
16 Q.  Okay. You anticipated my next question; is that the
17     last time you've spoken with Mr. Kessler?
18         MR. BENNETT: You need to answer.
19 BY MR. LONGSTRETH:
20 Q.  I'm sorry. I did — I did ask the question.
21         MR. BENNETT: You've got to answer.
22 A.  Which question?
23         MR. BENNETT: Repeat the question.
24 BY MR. LONGSTRETH:
25 Q.  Was that the last time you've spoken with Mr. Kessler?

**Page 15**

1  A.  Yes.
2  Q.  Okay. What I'm going to do now is, we've got three
3      documents from your attorney in response to the
4      subpoena, and I'd like to mark these with the next
5      Defendant's Exhibits — I think 55 now, and then 56 and
6      57. So this is 55. It's the repost from Mr. Kessler.
7      It might be what they call a meme.
8  A.  Probably.
9       (Deposition Exhibit No. 55, 56, 57, marked for
10      identification.)
11 BY MR. LONGSTRETH:
12 Q.  So we have marked as 55, 56, and 57, the three
13     documents we received from your attorney. Do you
14     recognize these documents, Mr. Boechat?
15 A.  Yes. This meme I reposted from the general feed at
16     Gab.ai.
17 Q.  And that's — you're pointing to Defendant's
18     Exhibit 55?
19         MR. BENNETT: You are? Yes.
20 A.  Yes.
21      (Colloquy off the record.)
22 BY MR. LONGSTRETH:
23 Q.  So 55 you just described. Can you describe what 56 is?
24 A.  This is 55. 56. What do you mean "describe"?
25 Q.  Can you state if you recognize it and know what it is?

**Page 16**

1  A.  It's the comment section on that posted meme.
2  Q.  Okay. And then 57, can you tell me what that is?
3         MR. BENNETT: It's this.
4  A.  Okay.
5         MR. LONGSTRETH: Actually, off the record.
6      (Colloquy off the record.)
7  A.  Apparently, this is my — I think I've been there two
8      or three times. Somehow I stupidly put together a
9      Facebook thing, although I don't use it, as you can
10     see.
11 BY MR. LONGSTRETH:
12 Q.  Mm-hmm.
13 A.  And — it's nice to have friends. And yeah, I guess
14     that's my activity log for my Facebook page.
15 Q.  Okay. And when did you produce that activity log?
16 A.  I didn't ever produce any such log.
17 Q.  Okay. Was that something that your attorney produced
18     to send to us to your knowledge?
19 A.  I presume.
20 Q.  Okay.
21         MR. BENNETT: And I can clarify as the
22     attorney.
23         MR. LONGSTRETH: Sure.
24         MR. BENNETT: Yes, generated by my office and
25     sent to him.

**Page 17**

1  MR. LONGSTRETH: And generated on June 20,
2  2018, is the date on there. You've got your own copy.
3  MR. BENNETT: Yes. If that's the date on
4  there, that sounds correct.
5  MR. LONGSTRETH: Okay. That would have been
6  soon after we contacted you about this.
7  BY MR. LONGSTRETH:
8  Q. Do you know why your attorney produced this -- don't
9  tell me about any conversations you had with your
10  attorney, but just, do you know why your attorney
11  produced this?
12  A. Well, if I can't talk about what he talked to me about,
13  then there's nothing to talk about.
14  Q. Okay.
15  A. I don't understand your question.
16  Q. The question is just yes or no. Do you know why he
17  produced it or don't you?
18  A. Oh, okay. Yes, I do.
19  Q. Okay. And why did you repost Mr. Kessler's post that's
20  now Defendant's Exhibit 55?
21  A. Because I thought it was -- I thought it was relevant
22  given a lot of things that's been going on in our
23  society for several years.
24  Q. Okay. And do you recall when you reposted it?
25  A. Oh, dear. Probably a month ago. I don't know.

**Page 18**

1  Something like that. That's my best recollection.
2  Q. Okay. I'll just represent for the record that it says
3  under Jason Kessler, 18 days, which suggests that it
4  was posted 18 days before this was run off and
5  delivered to us. Does that sound right to you?
6  A. Yeah, that sounds reasonable.
7  Q. Okay. So probably around the 1st of June maybe. I
8  think that would be get us to -- you can just -- I'm
9  stating that for the record as my understanding. You
10  can accept it or not accept it, as you wish.
11       What is Gab.ai?
12  A. It's an alternative spot like, I guess, I don't know
13  what Twitter is, so I'm speculating, but probably like
14  Twitter and somewhat like Facebook.
15  Q. Okay. And why do you post on Gab.ai?
16  A. Because I like it.
17  Q. Okay. Does Gab.ai draw people of any particular
18  political or ideological persuasion?
19  MR. BENNETT: I'll object for the record
20  under speculation, but go ahead and give your answer.
21  MR. LONGSTRETH: Well, he uses it and has
22  chosen to use it.
23       Go ahead
24  A. What's the question again?
25  MR. LONGSTRETH: Please read it.

**Page 19**

1  (The pending question was read by the court
2  reporter as follows:)
3  "Q. Does Gab.ai draw people of any particular political or
4  ideological persuasion?"
5  A. I would say that the vast majority of them are actually
6  libertarians.
7  BY MR. LONGSTRETH:
8  Q. Okay. As opposed to what?
9  A. As opposed to left or right.
10  Q. Okay. Do you know who set up Gab.ai?
11  A. No.
12  Q. Okay.
13  A. He comes on -- I think it's Andrew Torba or something
14  like that.
15  Q. Andrew Torba? Okay. Do you know anything about
16  Mr. Torba?
17  A. No.
18  Q. Okay. Do you know if Gab.ai posts are available to
19  people who go onto the forum to see what's posted
20  there? In other words, to people other than the people
21  who posted them?
22  A. I'm not sure how the mechanics of that place works.
23  Q. Okay.
24  A. I mean -- no. I guess. I don't know.
25  Q. Okay. Do you know how long Gab.ai posts remain

**Page 20**

1  available for viewing after they're posted?
2  A. No.
3  Q. Okay. Do you know if Gab.ai has a policy of
4  automatically deleting all posts made to the forum
5  within a period of about a week or so?
6  A. I was under the impression that they -- stuff was there
7  forever. I don't know.
8  Q. Do you know who Tom Kawczynski is?
9  K-a-w-c-z-y-n-s-k-i.
10  MR. BENNETT: I'm just going to object again,
11  the scope of that deposition --
12  MR. LONGSTRETH: Right.
13  MR. BENNETT: -- is about Mr. Kessler --
14  MR. LONGSTRETH: Yes.
15  MR. BENNETT: -- and is about
16  Charlottesville, and just for the record I want that --
17  MR. LONGSTRETH: I understand that, and I
18  will represent for the record that we have information
19  that links Mr. Kawczynski to the Charlottesville rally.
20  BY MR. LONGSTRETH:
21  Q. So can you answer the question?
22  A. I don't know him.
23  Q. You don't know him. Okay.
24       Have you ever seen him post on Gab.ai or any other
25  forum that you frequent?

**Page 21**

1  A.  I don't recall this guy.  I don't recall this guy.
2  Q.  Okay.  So your answer is no?
3  A.  No.
4          MR. LONGSTRETH:  I've got a document now I'd
5      like to have marked as DX 58.
6          (Deposition Exhibit No. 58, screenshot of posting,
7      marked for identification.)  ?
8  BY MR. LONGSTRETH:
9  Q.  After you're done reviewing it, my question will be
10     whether you recognize that document.
11 A.  Yes, I do.
12 Q.  Okay.  And what is it?
13 A.  It's something I've posted on GAB.
14 Q.  So you are "boechat1," "@boechat1"?
15 A.  I don't know what that — I mean, I guess that's how
16     they -- I'm on the GAB feed, I guess.
17 Q.  Okay.  And you talk about "the values we hold dear in
18     the GAB community."  Do you see that?
19 A.  Okay.
20 Q.  What is "the GAB community"?
21 A.  As I've said before, it is predominantly libertarian,
22     and there are a lot of — there are a lot of right-wing
23     people as well as actual, just basic run-of-the-mill
24     conservatives.
25 Q.  Mm-hmm.

**Page 22**

1  A.  And there are even some left-wing people who come on to
2      either be gadflies or just carry on a bit.  So there's
3      actually a fairly broad spectrum of people on it.  I'd
4      say most of them are libertarians.
5  Q.  Okay.  How would you describe yourself?
6  A.  I'm not sure that's germane to our conversation.
7          MR. BENNETT:  I'll object on relevance.
8          MR. LONGSTRETH:  Okay.
9          MR. BENNETT:  And also his privilege against
10     disclosing how you vote politically if the question's
11     getting at that.
12         MR. LONGSTRETH:  I'm just asking -- he's
13     mentioned libertarian.  I'm asking if he would describe
14     himself as libertarian or give himself some other
15     label.  I'm not asking how he votes.
16         THE WITNESS:  I'm not giving myself any
17     labels.
18         MR. LONGSTRETH:  Okay.  I've got another
19     exhibit that I'd like to mark as Defendant's
20     Exhibit 59.
21         (Deposition Exhibit No. 59, screenshot of posting,
22     marked for identification.)
23 BY MR. LONGSTRETH:
24 Q.  Again, my question will be if you recognize it and tell
25     me what it is.

**Page 23**

1  A.  This is something I posted on GAB.
2  Q.  Okay.  And again, if you look under -- it says, "Marcus
3      Boechat @boechat1" -- I'm sorry -- "boechat1."
4  A.  Mm-hmm.
5  Q.  So that's you?
6  A.  Yes.
7  Q.  Okay.  And "8 days" would indicate it had been posted
8      eight days before this was pulled off Gab.ai?
9  A.  I suppose.
10 Q.  Okay.  What do you mean when you say, "We are at war
11     with the left"?
12 A.  Well, JFK would now be considered a hard-right person.
13     That's all I need to say.  Okay?
14 Q.  Okay.
15 A.  Okay.  That's where we've gotten from when I was born
16     till now.
17 Q.  Okay.
18 A.  It's that simple.  I really don't have anything else to
19     say to you on that.
20         MR. BENNETT:  Just for the record, I just
21     want to put a standing objection in there to 58 and 59,
22     these two documents, and questions around them, because
23     they're not linked to Mr. Kessler directly and they're
24     not linked to the Charlottesville --
25         MR. KOLENICH:  Okay.

**Page 24**

1          MR. LONGSTRETH:  -- on the face of those
2      documents.
3          MR. LONGSTRETH:  Okay.  You can make that
4      provisional objection.
5  BY MR. LONGSTRETH:
6  Q.  When you say "war," what do you mean by "war"?
7  A.  I mean, that concerted voting efforts have to be made,
8      as they have been done made recently, to bring back our
9      country.
10 Q.  Okay.  So in your mind, "war" is voting efforts?
11 A.  Yes.
12 Q.  And you think anybody reading that post would
13     understand that by "war" you mean voting efforts?
14         MR. BENNETT:  Objection.  It's calling for
15     Mr. Boechat to speculate on what other people would
16     think reading this.
17         MR. LONGSTRETH:  Okay.
18         MR. BENNETT:  He can talk about his own
19     intention, what he --
20 BY MR. LONGSTRETH:
21 Q.  Why don't you answer that question?
22 A.  Which question again?
23 Q.  The question I just "answered."  [sic]
24     Well, let me -- actually let me do this.
25         MR. BENNETT:  Can you repeat it again?

### Page 25

1  MR. LONGSTRETH: Actually, let me do this.
2  I'm going to withdraw it and ask another question.
3  BY MR. LONGSTRETH:
4  Q.  So you intended, when you used the word "war," that
5      people would understand the word "war" to mean voting
6      efforts?
7  A.  Yes.
8  Q.  That's your testimony?
9  A.  Yes.
10 Q.  Okay. Who are "third-world vermin"?
11 A.  People, 68 percent of which are sitting on welfare the
12     minute they show up here.
13 Q.  Okay. People, which people?
14 A.  Wherever. Doesn't matter where they're from.
15 Q.  Okay. You say, "All is fair in love and war." Do you
16     see that?
17 A.  That's an expression.
18 Q.  Okay. What did you intend that expression to mean when
19     you used it here?
20 A.  I intend it to mean that people need to understand how
21     to clarify and to fully understand what their real
22     interests long term are and to vote in that direction;
23     that's what I meant.
24 Q.  Have you ever expressed the view that this war should
25     include military action or other violence?

### Page 26

1  A.  No.
2      MR. LONGSTRETH: Can we mark this as DX 60?
3      (Deposition Exhibit No. 60, screenshot of
4      posting, marked for identification.)
5  BY MR. LONGSTRETH:
6  Q.  Just ask if you recognize that and if you could tell me
7      what this is?
8  A.  Yes. I posted it on GAB.
9  Q.  Okay. And again, about 15 days before it was pulled?
10 A.  I suppose.
11 Q.  Okay. And do you see reference to "our peoples rising
12     up in military fashion"?
13 A.  Yes.
14 Q.  What did you mean by that?
15     MR. BENNETT: Objection. It's
16     straightforward from the wording on that document: "I
17     believe our people will rise up in military fashion."
18     MR. LONGSTRETH: Okay. Your objection is
19     noted. I'd like the witness to answer the question
20     that was posed to him.
21 A.  What is your question?
22     MR. LONGSTRETH: Please read it back.
23     Your objection will be noted.
24     (The prior and pending questions were read back as
25     follows:)

### Page 27

1  "Q.  And do you see reference to 'our peoples rising up in
2      military fashion'?"
3  "A.  Yes."
4  "Q.  What did you mean by that?"
5  A.  Has it ever occurred to you that people get frustrated?
6      That's my answer; people get frustrated.
7  Q.  Okay. So that you're saying that frustrated people
8      will rise up in military fashion?
9  A.  No. Come on. I spoke about the ballot box right
10     before there.
11 Q.  Okay.
12 A.  Okay?
13 Q.  So if they're not successful at the ballot box, they
14     will rise up in military fashion; is that what you
15     meant?
16 A.  Well, I mean -- I have no idea. That's speculation.
17 Q.  Well, you wrote it. Are you saying you're speculating
18     about the meaning of what you, yourself, wrote?
19     It's okay to just answer the question.
20 A.  I think, over the very long term, you could get to that
21     point. I think the American people are more
22     intelligent than that and are actually long sufferingly
23     patient, so --
24     MR. LONGSTRETH: Okay. I have a document I'd
25     like to mark as Defendant's Exhibit 61.

### Page 28

1      (Defendant's Exhibit No. 61, screenshot of
2      posting, marked for identification.)
3  BY MR. LONGSTRETH:
4  Q.  And again I'd like to ask you, as I did before, what
5      this document is?
6  A.  This is a Jason Kessler post, I think.
7  Q.  It is?
8  A.  Yeah.
9  Q.  And what do you see Mr. Kessler as stating?
10 A.  The whole threat to white people, blah, blah, blah.
11 Q.  Okay. And do you see where he talks about, "Do we have
12     200 men to stand publicly for our rights?"
13     MR. LONGSTRETH: I'm just going to have the
14     witness -- I'm just going to have the record note -- we
15     don't have a video deposition here -- that at a number
16     of my questions, Mr. Boechat is rolling his eyes,
17     sighing, lifting his eyes up to the heaven.
18 A.  Frustration is frustration. It's that simple.
19 BY MR. LONGSTRETH:
20 Q.  So you're frustrated right now, Mr. Boechat?
21 A.  No. I was frustrated when I wrote that. It's a
22     function of frustration when people say things,
23     sometimes --
24 Q.  Okay.
25 A.  -- not always, but sometimes.

**Page 29**

1  Q.  Okay. You say you were frustrated when you wrote — if
2      you look down, when you wrote what you wrote here?
3  A.  Yes. I would say so, yeah.
4  Q.  Okay. So that is you, Mr. Boechat, "I'm with you. Let
5      us collect another 198 men"?
6  A.  Yeah. It's foolish and adolescent of me to have
7      written that, but yes, that's -- I wrote that out of
8      frustration.
9  Q.  Okay. Now you were asked, remember, at the beginning
10     of your deposition, whether you'd searched for all your
11     documents referring to communications with Mr. Kessler,
12     were you not?
13 A.  Mm-hmm.
14 Q.  I need an answer.
15 A.  This is it.
16 Q.  Yes or no.
17 A.  Whatever we got for you, that reposting of Kessler is
18     it.
19 Q.  How about this document that's been marked as
20     Defendant's 61; did you provide us that?
21 A.  I looked through -- there were a tremendous number of
22     postings, and I didn't — I probably didn't see that or
23     whatever. I just was going through all of them.
24 Q.  And how did you look for those postings? Did you --
25 A.  Well, I went through the feed. Feed, feed, feed.

**Page 30**

1  Q.  Did you use the search function?
2  A.  No.
3  Q.  You didn't use a search function?
4  A.  No.
5  Q.  So you didn't, for example, go to your feed and search
6      for anything that mentioned "Kessler" or
7      "Charlottesville"; is that correct?
8  A.  I just went through each — what I thought was each and
9      everything that I had posted along the way. That's all
10     I did.
11 Q.  Right. And this was the one you happened to miss.
12 A.  I imagine I've missed others as well, but yeah, I guess
13     I did.
14 Q.  You did miss this one.
15         When you said, "Let us collect one hundred and
16     nine -- another hundred and nine — well, let me ask
17     you this: When you say, "Let us collect another 198
18     men," collect them for what?
19 A.  I guess he's talking about whatever he's planning
20     there.
21 Q.  And what --
22 A.  It's pretty over the top, now that I look at it a
23     second time, what he wrote.
24 Q.  Okay. What do you mean by "over the top"?
25 A.  Well, I mean, we're nowhere near as a country to be at

**Page 31**

1      a point where people need to get that drastic at all,
2      and so I should have known better than to think that he
3      was a person with his head screwed on straight.
4  Q.  Okay. When you get to that point at all, you mean you
5      understood him to be proposing collecting 200 men to
6      stand up publicly for the kind of military uprising you
7      were talking about before, when people are frustrated?
8  A.  I suppose he was talking -- I supposed that he was
9      talking about, you know, his marches or whatever it is
10     that he was doing.
11 Q.  Okay. Had you heard of the Charlottesville event,
12     march, rally, demonstration, whatever you want to call
13     it, that was held on August 12th of last year?
14 A.  I briefly heard of it. I didn't even really look into
15     it.
16 Q.  Okay.
17 A.  All I heard was that some sort of thing had happened,
18     and somebody had gotten killed or hurt or whatever.
19 Q.  Okay.
20 A.  And I remember coming away from that thinking, Well,
21     that was dumb. That doesn't get anybody anywhere.
22 Q.  Okay. Did you understand that a large number of
23     militia members had descended on Charlottesville on
24     that day?
25 A.  No.

**Page 32**

1  Q.  Okay. Did you understand that many of them were armed
2      with bats and shields that they intended to use in harm
3      against what they considered to be antifascist
4      counter-protesters?
5  A.  Is this what they said?
6  Q.  I'm asking a question. You don't get to ask me
7      questions. I get to ask you questions.
8  A.  I have no idea.
9  Q.  Okay. Do you remember someone was killed in
10     Charlottesville last year?
11 A.  I was told that, yeah.
12 Q.  By whom?
13 A.  (Indicating Mr. Bennett.)
14 Q.  Oh, I'm sorry. You were told that in preparation for
15     your deposition?
16 A.  Yeah. I didn't know.
17 Q.  Okay.
18 A.  I had no idea. I had no idea.
19 Q.  Okay. So what were you planning to collect another 198
20     men for?
21 A.  I'm assuming that he's talking about marches and stuff
22     like that. I had no — I had no — even as crazy as he
23     sounds, I didn't think he was going beyond anything
24     like that.
25 Q.  Okay.

**Page 33**

1  A. It was foolish for me to post back anything
2     regardless —
3  Q. Okay.
4  A. -- because he's clearly kind of -- clearly is a pretty
5     unbalanced dude.
6  Q. You see that Mr. Kessler says, "DM your e-mail"; right?
7     In response to your offer of 198 men, he says, "DM your
8     e-mail." Do you see that?
9  A. I don't know what he -- what is he talking about? What
10    do you mean, "DM"? Oh. Oh, well, I didn't DM anything
11    to him.
12 Q. Okay. Did you provide him your phone number?
13 A. No.
14 Q. Okay.
15 A. He asked me for -- as I told you before, he asked me
16    for my phone number, and I didn't give it to him
17    because I thought, Whoa, who the heck is this guy? I
18    don't want to communicate directly with anybody here,
19    you know.
20 Q. When did he ask you for your phone number?
21 A. Shortly after I posted his -- I think after his -- that
22    meme that we, you know —
23 Q. Okay. So this was before he called you after you got
24    the subpoena?
25 A. No. He called me before I got the subpoena.

**Page 34**

1  Q. Right. But when did he ask you for your phone number?
2  A. Well, before he called me.
3  Q. So that would be a communication before he called you,
4     would it not be? He wouldn't call you and ask you for
5     your phone number, would he?
6  A. I didn't give him my phone number. He somehow found my
7     phone number and called me.
8  Q. But you testified he asked you for his phone — you
9     testified he asked you for your phone number?
10 A. Yes.
11 Q. When did he ask you for your phone number?
12 A. I have no idea.
13 Q. But it would have been before he called you on that
14    phone --
15 A. Well --
16 Q. -- number; right?
17 A. -- yeah, I think --
18 Q. So there's —
19 A. -- so.
20 Q. -- another communication with Mr. Kessler that you
21    haven't disclosed —
22 A. No —
23 Q. -- isn't there?
24 A. -- there is not. There is not. What I've done -- what
25    I've -- what I've told you stands.

**Page 35**

1        MR. BENNETT: I would have to check --
2        MR. LONGSTRETH: (Laughing.) I'm sorry. I
3     don't mean to -- it obviously does stand.
4        MR. BENNETT: For the record --
5        MR. LONGSTRETH: Yes.
6        MR. BENNETT: -- just my understanding, I'd
7     have to check my e-mail, but when I did send the
8     documents back, I believe I made reference to an
9     attempt by Mr. Kessler to get a phone number.
10 BY MR. LONGSTRETH:
11 Q. And when was that?
12       MR. LONGSTRETH: I'm asking the witness now,
13    please. I'm not asking you — I'm not asking you to
14    testify. I'm asking the witness.
15 A. The timeline which I'm —
16 BY MR. LONGSTRETH:
17 Q. When was that?
18 A. -- pretty vague on -- but the timeline, which I'm
19    pretty vague on is, I guess, a couple of days after I
20    posted this -- reposted his meme, I would say.
21 Q. Okay. So you reposted his meme — you reposted his
22    meme. He asked you to DM your e-mail.
23 A. Mm-hmm.
24 Q. I'm sorry?
25 A. I don't even know what "DM" means, to be honest. I

**Page 36**

1     really don't. What does "DM" mean?
2  Q. Okay. If I represent to you that "DM" means "direct
3     message" --
4  A. Okay.
5  Q. -- would that refresh your recollection as to what "DM"
6     means?
7  A. I don't know — I did not know what "DM" means.
8  Q. Okay. So I take it, you did not DM your e-mail then?
9  A. No.
10 Q. Okay. And then you're saying sometime after that,
11    Mr. Kessler called and asked for your phone number?
12 A. No, he didn't call. He sent -- I don't know where on
13    GAB he sent -- you know, I guess on my page or
14    whatever --
15 Q. Okay.
16 A. -- he sent me a, you know, "Send me your phone number."
17    And I thought, What the heck? I'm not going to talk to
18    you.
19       MR. LONGSTRETH: Can I just ask your
20    attorney, for the record now, if you can make another
21    search to see if you could see whether such a
22    communication was made, and whether you have it, and
23    turn it over to us in response to the subpoena? I'm
24    making that request.
25       MR. BENNETT: Fine. I hear the request. I

```
 1    don't know if there is a search function on GAB, a
 2    formal search function, how it works, if it's
 3    effective, but I hear the request.
 4         MR. LONGSTRETH:  Okay.
 5         MR. BENNETT:  And I'll speak to
 6    Mr. Boechat --
 7         MR. LONGSTRETH:  Okay.
 8         MR. BENNETT:  -- at a break about that.
 9         MR. LONGSTRETH:  Yeah.  And I'm not sure
10    we'll have a break.  We'll see how long we go.
11         MR. BENNETT:  Yes.
12         MR. LONGSTRETH:  But I'd just state for the
13    record that, faced with a subpoena for communications
14    concerning Mr. Kessler and Charlottesville, and faced
15    with the fact that he does have at least some relevant
16    information on Gab.ai, I think it would have behooved
17    you to find out if there was a search function so we
18    could find more, but in any event, if you're willing to
19    do that now, I would appreciate it, and hopefully, we
20    won't have to get the court involved.  Thank you.
21  BY MR. LONGSTRETH:
22  Q.   So in this communication where he called you and asked
23       for your phone number, tell me what else you recall
24       about that communication.
25  A.   I explained to you in full everything I recall from our
                                                             37
```

```
 1    original conversation.
 2  Q.   Okay.  If you look at this post, it says that
 3       Mr. Kessler, he edited the post.  Do you see that?
 4       It's right under his name at the top.
 5  A.   Okay.
 6  Q.   So yes, you see that?
 7  A.   Mm-hmm.
 8  Q.   Okay.  And do you know when you said, "I'm with you.
 9       Let us collect another 198 men."  Do you know if you're
10       responding to his original post or his edited post?
11  A.   I don't recall.  I mean, I don't know.
12  Q.   Okay.  Do you recall what the post said before it was
13       edited?
14  A.   I don't recall the original post.
15  Q.   Okay.  If I told you that the original post -- in the
16       original post Mr. Kessler was soliciting help from at
17       least 200 people who are, quote, "training to fight,"
18       out-quote?  Would that refresh your recollection as to
19       what the original post said?
20  A.   No, it doesn't.
21  Q.   It does not?
22  A.   No, I don't recall any talk of training anybody.
23  Q.   Okay.  So your testimony is, you don't recall what was
24       in the original post?
25  A.   No.
                                                             38
```

```
 1  Q.   Mr. Boechat, is your e-mail address
 2       "grayledge@midmaine.com"?
 3  A.   Mm-hmm.
 4  Q.   I need a yes or no, please.
 5  A.   Yes.  Yes.
 6  Q.   Do you have any other e-mail addresses that you
 7       regularly use?
 8  A.   No.
 9  Q.   I asked you before if you knew an individual named Tom
10       Kawczynski.  K-a-w-c-y-z-n-s-k-i.  I don't know if the
11       "W" is pronounced.  It could be Tom Kawcyznski or
12       Kawczynski.  Does anything we've talked about it
13       refresh your recollection as to whether you know of an
14       individual named Mr. Kawczynski?
15  A.   I do not know this man.
16  Q.   Okay.  What is Tactical American Patriots?
17  A.   I have no idea.
18  Q.   Have you ever posted to a Facebook group known as
19       Tactical American Patriots?
20  A.   I have never posted on Facebook, period.
21  Q.   Okay.  Did you ever post sometime last month with
22       reference to Mr. Kessler's planned rally, quote, "Ah,
23       yeah, total shutdown of dissent is the plan.  Up to us
24       to break the plan and take back what is ours,"
25       out-quote?
                                                             39
```

```
 1  A.   Somebody -- that is a total fabrication, whatever that
 2       is.
 3         MR. BENNETT:  Can I clarify?  Where -- when
 4    you say, have you ever posted, is that on GAB.ai or
 5    Facebook or anywhere, just to clarify the question?
 6  BY MR. LONGSTRETH:
 7  Q.   Did you --
 8  A.   I didn't write that.
 9  Q.   Okay.  You didn't write that.  Okay.  Do you know who
10       did write that?
11  A.   I have no idea.
12  Q.   Okay.  Do you know who Rob Alex is?
13  A.   No.
14  Q.   Do you know who "WhiteKnight1488" is?
15  A.   Never heard of him.
16  Q.   Do you know what "1488" means?
17  A.   I don't know.
18  Q.   Do you know that "1488" is a Neonazi thing?
19  A.   All right.  No.  I don't know.
20  Q.   Okay.  Do you know if "88" is a code for "Heil Hitler"
21       because eight is the eighth letter of the alphabet?
22  A.   Huh.  Clever.
23         MR. BENNETT:  The question was, did you know
24    that?
25  A.   No.  No.  I didn't.
                                                             40
```

**Page 41**

1 Q. Do you know who Pepe The Frog is?
2 A. Yeah, I saw him -- the meme'ing during the election.
3    There was a lot of Pepe the Frog.
4 Q. Okay. And what do you understand Pepe the Frog to
5    represent?
6 A. Conservatives.
7 Q. Extreme right-wing conservatives?
8 A. Not necessarily.
9 Q. Neonazis?
10 A. No.
11 Q. Just conservatives?
12 A. Predominantly, yes.
13 Q. All right. And you have an image of Pepe the Frog on
14    your home page on Gab.ai, do you not?
15 A. I don't know. Maybe I — I have no idea.
16 Q. I'm just going to —
17 A. You mean on my — on the front thing? No.
18 Q. Yeah.
19 A. No. I do not. If it's there now, someone's put it
20    there.
21 Q. Okay. I'm just going to show it to you.
22 A. I don't know how --
23 Q. I'm just going to show it to you here. Do you recognize
24    that --
25 A. Where?

**Page 42**

1 Q. Do you recognize that page?
2    MR. BENNETT: He's being shown a page from
3    Gab.ai; is that correct?
4 A. Yeah.
5    MR. LONGSTRETH: That's right.
6 A. That's my page.
7 BY MR. LONGSTRETH:
8 Q. That's your page.
9    MR. BENNETT: A home page.
10 A. That's GAB -- that's a GAB thing. That's not mine.
11 BY MR. LONGSTRETH:
12 Q. That's not yours. Okay.
13 A. That's GAB's.
14 Q. Okay.
15 A. Geez.
16    MR. LONGSTRETH: Okay. (Cell phone ringing)
17    Sorry about that.
18    MR. LONGSTRETH: And I'm just going to mark
19    for the record -- we're at Defendant's 62.
20    (Defendant's Exhibit No. 62, home page screenshot,
21    marked for identification.)
22    MR. LONGSTRETH: And I'll just --
23    MR. BENNETT: 62 is a copy of the home page?
24 BY MR. LONGSTRETH:
25 Q. That's my attempt to copy it, yes. The reason I wanted

**Page 43**

1    to show the home page was the copy is not quite as
2    clear as this, but just want to state for the record
3    is the -- whether that appears to be a copy of what's
4    on the computer screen?
5    MR. BENNETT: Understood. And again, that
6    standing objection, I'm going to put that there again
7    just on relevance.
8    MR. LONGSTRETH: I understand.
9    MR. BENNETT: It's not related to the subject
10    matter of the deposition.
11    MR. LONGSTRETH: Understood.
12 BY MR. LONGSTRETH:
13 Q. I'm sorry. Is the answer yes then to the question,
14    subject to the objection?
15 A. You've got to repeat the question.
16    MR. LONGSTRETH: I'm sorry. I'd prefer to
17    have the court reporter do it.
18    (The pending question was read back by the court
19    reporter as follows:)
20 "Q. That's my attempt to copy it, yes. The reason I wanted
21    to show the home page was the copy is not quite as
22    clear as this, but just want to state for the record
23    is the -- whether that appears to be a copy of what's
24    on the computer screen?"
25 A. Yes, it does appear to be the copy.

**Page 44**

1 BY MR. LONGSTRETH:
2 Q. And is that an account that you still maintain as
3    active on Gab.ai?
4 A. I haven't done anything on it in weeks, but it's —
5    yeah, it's up. It's there.
6 Q. Okay. When you say weeks, about how many weeks?
7 A. I don't know. A couple weeks, three weeks, something
8    like that.
9 Q. Okay. If I represent to you that, looking through your
10    posts on that, it appears you stopped posting on it
11    about 15 days ago? Does that sound right to you?
12 A. Probably, 15, 20 days, something like that.
13 Q. Okay. And again, your handle or name or whatever on
14    that is "boechat1"?
15 A. Yes.
16 Q. Okay. I'm going to ask a question about some
17    individuals, and ask if you've ever met them or know
18    who they are.
19    MR. BENNETT: As to those questions, again
20    that standing objection. If they're not
21    Charlottesville and they're not Mr. Kessler, I'm
22    objecting on the grounds of relevance —
23    MR. LONGSTRETH: I understand.
24    MR. BENNETT: -- that they're outside the
25    scope of the deposition.

```
 1           MR. LONGSTRETH: I understand.
 2           MR. BENNETT: Thank you.
 3   BY MR. LONGSTRETH:
 4   Q.  Richard Spencer?
 5   A.  No.
 6   Q.  Christopher Cantwell?
 7   A.  No.
 8   Q.  James Alex Fields, Junior?
 9   A.  No.
10   Q.  Do you know who Richard Spencer is?
11   A.  I think he's some sort of right-wing guy. That's as
12       far as I know.
13   Q.  Okay. How about Mr. Cantwell? Have you ever --
14   A.  No.
15   Q.  -- heard anything about him?
16           MR. BENNETT: And is the purpose of these
17       questions whether Mr. Boechat's spoken to these people
18       or whether he knows of them? What's he answering?
19       What do you want him to answer?
20           MR. LONGSTRETH: Well, the first question was
21       whether he's spoken to them, and the second question is
22       whether he -- and then I followed up with whether he's
23       heard of them. I hope it was clear for the record, but
24       thanks for the clarification.
25           MR. BENNETT: I'm not sure there's a pending
                                                               45
 1       question.
 2           MR. LONGSTRETH: Right.
 3           MR. BENNETT: So wait for the next question.
 4   BY MR. LONGSTRETH:
 5   Q.  Christopher Cantwell, have you heard him?
 6   A.  No.
 7   Q.  Have you ever heard of somebody known as the Crying
 8       Nazi?
 9   A.  No.
10   Q.  Vanguard America?
11   A.  No.
12   Q.  Never heard of them.
13           Andrew Anglin, have you ever heard of him?
14   A.  No.
15   Q.  Okay. Do you remember there was a cover article in the
16       "Atlantic" magazine —
17   A.  I don't read the "Atlantic."
18   Q.  You don't read the "Atlantic." So you don't remember
19       seeing Mr. Anglin's picture on "Atlantic" magazine?
20   A.  I don't know who that is.
21   Q.  Moonbase Holdings, LLC.
22   A.  I have no idea.
23   Q.  Robert Azzmador Ray?
24   A.  No.
25   Q.  Elliot Kline, also known as Eli Mosley?
                                                               46
 1   A.  No.
 2   Q.  Do you know who Oswald Mosley was?
 3   A.  No.
 4   Q.  Okay. Identity Europa?
 5   A.  Young people doing things in Europe to -- mostly just
 6       doing their marches and things like that.
 7   Q.  Okay. Are they marching for anything in particular?
 8   A.  Seems that they're marching to -- in a probably vane
 9       attempt at pointing out to people that their culture is
10       under tremendous pressure.
11   Q.  Matthew Heimbach?
12   A.  No. Never heard of him.
13   Q.  Do you know who he is?
14   A.  No.
15   Q.  Okay. I'm going to switch now to just, "do you know
16       who these people are?"
17   A.  Okay.
18   Q.  Matthew Parrot?
19   A.  No.
20   Q.  Also known as David Matthew Parrot?
21   A.  No.
22   Q.  The Traditionalist Worker Party?
23   A.  No.
24   Q.  Michael Hill?
25   A.  No.
                                                               47
 1   Q.  Michael Tubbs?
 2   A.  No.
 3   Q.  The League of the South?
 4   A.  No.
 5   Q.  Jeff Schoep? S-c-h-o-e-p.
 6   A.  I know a Jeff Shepp from Blue Hill, but I don't think
 7       it's the same spelling.
 8           MR. BENNETT: Could you spell that?
 9   Q.  S-c-h-o-e-p.
10   A.  No.
11   BY MR. LONGSTRETH:
12   Q.  Okay. National Socialist Movement?
13   A.  No.
14   Q.  Nationalist Front?
15   A.  No.
16   Q.  Augustus Sol Invictus? Or August Invictus?
17   A.  I don't know.
18   Q.  The Fraternal Order of the Alt Knights?
19   A.  No.
20   Q.  Michael Enoch Peinovich?
21   A.  No.
22   Q.  The Loyal White Knights of the Ku Klux Klan?
23   A.  No — well, everyone knows what the Klan is, but I
24       don't — I don't fraternize with them —
25   Q.  Okay.
                                                               48
```

1  A.   -- or know them.
2  Q.   Do you know anybody who is a member of the Klan?
3  A.   No.
4  Q.   Do you know if the Klan was present in Charlottesville
5       last August?
6  A.   I have no idea.
7  Q.   Okay. The East Coast Knights of the Ku Klux Klan, also
8       known as the East Coast Knights of the True Invisible
9       Empire?
10 A.   I thought that they were all from the South, but no.
11 Q.   Okay. Mr. Boechat, do you have any plans to be in
12      Charlottesville on August 11 or 12 of this year?
13 A.   No.
14 Q.   Were you in Charlottesville in August last year?
15 A.   No.
16 Q.   Do you have any plans to be in Washington, DC, on
17      August 11 or 12 of this year?
18           MR. BENNETT: Just subject to that objection,
19      it's outside the scope of the --
20           MR. LONGSTRETH: Yeah. Mr. Kessler is now
21      planning a rally in DC.
22 A.   No.
23           MR. LONGSTRETH: And just for the record, I
24      think you can assume that I'm not asking these
25      questions for sport.

                                                            49

1  BY MR. LONGSTRETH:
2  Q.   Okay. Have you had any other communications that you
3       can recall right now with anyone concerning a planned
4       rally in either Washington, DC, or Charlottesville,
5       Virginia, on August 11 or 12?
6  A.   No.
7            MR. LONGSTRETH: Okay. Subject to the
8       request that we made, that an additional search be made
9       to see if Mr. Boechat has other documents responsive to
10      our subpoena, I think we're concluded. Thank you.
11           MR. BENNETT: We have Mr. --
12           MR. LONGSTRETH: I'm sorry. Mr. Kolenich,
13      I'm sorry. I forgot about you, Jim. You were so
14      quiet. Do you have any questions for this witness?
15           MR. KOLENICH: No. No, I do not.
16           MR. LONGSTRETH: Okay. Do you guys have
17      anything you'd like to follow up on?
18           MR. MILLS: Read and sign.
19           MR. LONGSTRETH: Yeah. Would you like to
20      waive reading and signature or would you like to read a
21      copy and —
22           MR. BENNETT: He'd like to see it and read
23      it.
24           MR. LONGSTRETH: Okay. He'd like to review
25      it? Okay. We've got it on five days, so it should be

                                                            50

1       sometime within the next week.
2            (The deposition concluded at 10:39 a.m.)
3                    *   *   *   *   *

                                                            51

1                          CERTIFICATE
2            I, Christine Fraga Thornton, RPR, a Notary Public
3  in and for the State of Maine, hereby certify that on June
4  29, 2018, personally appeared before me MARCUS BOECHAT, the
5  within-named deponent, who was sworn to testify to the
6  truth, the whole truth, and nothing but the truth in the
7  cause of action now pending in the U.S. District Court,
8  Western District of Virginia, and that this deposition was
9  stenographically reported by me and later reduced to
10 typewritten form with the aid of Computer-Aided
11 Transcription, and the foregoing is a full and true record
12 of the testimony given by the witness.
13           I further certify that I am a disinterested person
14 in the event or outcome of the above-named cause of action.
15           IN WITNESS WHEREOF, I subscribe my hand and affix
16 my seal July 9, 2018.

                        Christine Fraga Thornton, RPR
                        Notary Public, Court Reporter

   My Commission Expires April 10, 2021.

                                                            52

```
 1
 2              ERRATA SHEET INSTRUCTIONS
 3       Please note on the attached errata sheet any changes in
 4  form or substance of the testimony contained in the
 5  deposition transcript.  For each change, be sure to give
 6  the page and the line number(s), the word(s) you wish
 7  changed and the reason for the change.  Please do not make
 8  any marks or changes directly on the transcript.  If no
 9  changes or corrections are necessary, please indicate that
10  on the errata page.
11       The deponent must also sign the signature page and
12  have it witnessed by an attorney or notarized.  Please
13  return these to our office within thirty (30) days.
14  Failure to return the errata page within the prescribed 30
15  days will constitute a waiver of signature.
16       In the event you have been provided a copy for reading
17  and signing, please return it to our office when reading and
18  signing is complete.  This transcript is not to be copied.
19       Please feel free to contact our office if you have any
20  questions regarding this procedure.
21                         Thank you,
22                  DON THOMPSON & ASSOCIATES, INC.
                    Court Reporting and Video Conferencing
23                         PO Box 2236
                     Bangor, ME 04402-2236
24     207-394-3900 - dtreport@myottmail.com - www.dtmainereporter.com
25
```

```
                     DEPOSITION ERRATA SHEET
 3  Page No.____ Line No.____ Change to:_____
 4  _____
 5  Reason for change:_____
 6
 7  Page No.____ Line No.____ Change to:_____
 8  _____
 9  Reason for change:_____
10  Page No.____ Line No.____ Change to:_____
11  _____
12  Reason for change:_____
13
14  Page No.____ Line No.____ Change to:_____
15  _____
16  Reason for change:_____
17  Page No.____ Line No.____ Change to:_____
18  _____
19  Reason for change:_____
20
21  Page No.____ Line No.____ Change to:_____
22  _____
23  Reason for change:_____
24
25
```

```
 1                      SIGNATURE PAGE
 2  TO BE COMPLETED BY DEPONENT:
 3       I, MARCUS BOECHAT, have read or had read to me the
    foregoing pages of my deposition and have noted any errors
 4  in form or substance of my testimony, together with their
    respective corrections and the reasons therefore on the
 5  following errata page.
 6       (Signature)_____
 7       (Date)_____
 8       Name of person reading transcript to deponent if
    deponent cannot read:
 9   _____
10                      * * * * *
11  TO BE COMPLETED BY NOTARY PUBLIC/ATTORNEY:
12       I, _____, a
    Notary Public/Attorney, hereby acknowledge that the
13  above-named deponent personally appeared before me and
    affixed his/her signature above as his/her own true act and
14  deed.
15       (Signature)_____
16       (Date)_____
         My Commission Expires:_____
17
    Title: Kessler v. City of Charlottesville, et al.
18  Jurisdiction:  U.S. District Court, Western District
          of Virginia
19  Date of Deposition:  June 29, 2018
    Transcript Mailing Date:  July 9, 2018
20
    Noticing Party:
21       James Longstreth, Esq.
         K&L Gates, LLP
22  Copies Sent To:
         James Kolenich, Esq. (via e-mail)
23
         Justin Bennett, Esq., and Barry Mills, Esq.
24       HALE & HAMLIN
25  Reporter:  Christine F. Thornton, RPR
```